RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

  *v.*

TOMMY SHANE CONATSER (06-5694), PATRICK
MARLOWE (06-5946),

    *Defendants-Appellants.*

Nos. 06-5694/5946

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00129—Todd J. Campbell, Chief District Judge.

Argued: December 4, 2007

Decided and Filed: February 4, 2008

Before: GUY, MOORE, and GILMAN, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Phillip L. Davidson, Nashville, Tennessee, David L. Raybin, HOLLINS, WAGSTER, YARBROUGH, WEATHERLY & RAYBIN, Nashville, Tennessee, for Appellants. Angela M. Miller, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Phillip L. Davidson, Nashville, Tennessee, David L. Raybin, Patrick T. McNally, HOLLINS, WAGSTER, YARBROUGH, WEATHERLY & RAYBIN, Nashville, Tennessee, for Appellants. Angela M. Miller, Jessica Dunsay Silver, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

  GUY, J., delivered the opinion of the court, in which GILMAN, J., joined. MOORE, J. (pp. 17-20), delivered a separate opinion concurring in part and concurring in the judgment.

_____

### OPINION

_____

  RALPH B. GUY, JR., Circuit Judge. Defendants Tommy Shane Conatser and Patrick Marlowe were convicted following a jury trial on charges arising from their participation as corrections officers in a conspiracy to violate the rights of detainees and prisoners of the county jail in Wilson County, Tennessee. Conatser, who was convicted of the conspiracy charged in count 1, challenges the sufficiency of the evidence to support that conviction as well as the reasonableness of his 70-month sentence. Marlowe, the supervisor of the second shift, was convicted of conspiracy

1

and six of the seven substantive charges brought against him. Without appealing his convictions, Marlowe raises several challenges to the life sentence imposed on count 3 for his part in the denial of necessary and appropriate medical care that resulted in the death of detainee Walter Kuntz in violation of Kuntz's civil rights. After review of the record and the arguments presented on appeal, we affirm in all respects.

## I.

### A.       Procedural History

The investigation into the death of detainee Walter Kuntz from injuries inflicted while in custody on January 13, 2003, led to an 8-count indictment in this case. The conspiracy count alleged that between July 2001 and January 2003, Marlowe, Conatser, and codefendants Gary Hale, Robert Ferrell, and Robert Locke conspired to "injure, oppress, threaten and intimidate detainees and prisoners at the Wilson County Jail in the free exercise and enjoyment of the rights and privileges secured to them by the Constitution and laws of the United States, namely the rights not to be deprived of liberty without due process of law and to be free from cruel and unusual punishment while in official custody and detention." 18 U.S.C. § 241. It was alleged that, as the means, manner, and object of the conspiracy, the coconspirators would punish, harm, and intimidate by striking, punching, kicking, and assaulting detainees and prisoners; discuss and brag about the assaults, including keeping a tally of those individuals rendered unconscious by Marlowe; and conceal such assaults by withholding medical care and falsifying incident reports.

Nineteen overt acts were alleged in furtherance of the conspiracy—seven of which were also charged as substantive offenses. The substantive counts asserted that the various defendants, aided and abetted by each other, assaulted certain prisoners and detainees (collectively referred to as inmates) in violation of their civil rights. 18 U.S.C. §§ 242 and 2. The statute provides for enhanced penalties of (1) imprisonment for not more than 10 years "if bodily injury results from the acts committed in violation of this section," and (2) any term of years or for life "if death results from the acts committed in violation of this section." 18 U.S.C. § 242. Both Hale and Ferrell pleaded guilty to a single count under a plea agreement and testified at trial. Locke was tried jointly with Marlowe and Conatser, but was acquitted of both conspiracy and the one substantive charge against him. Marlowe and Conatser were convicted of the conspiracy.

Central to Marlowe's appeal are his convictions on counts 2 and 3, which alleged that Marlowe and Hale, aided and abetted by each other, assaulted Kuntz (count 2) and failed to provide him with necessary and appropriate medical care (count 3) in violation of his civil rights and that their conduct resulted in bodily injury or death. The jury specifically found in convicting Marlowe that the acts at issue in the assaults that violated Kuntz's rights resulted in bodily injury (but not death), but that the acts at issue in the denial of medical care that violated Kuntz's rights resulted in Kuntz's death. As a result, the statutory penalty for Marlowe's conviction on count 3 was any term of years or life imprisonment.

Counts 4 through 8 alleged assaults on inmates that resulted in bodily injury. Specifically, the indictment charged that Marlowe, Conatser, and another officer assaulted Paul Armes on April 30, 2002 (count 4); that Marlowe and others assaulted Sergio Martinez on October 6, 2001 (count 5); that Marlowe and Conatser assaulted Kenneth McIntyre in July 2001 (count 6); that Marlowe, Hale, Ferrell, and Locke assaulted Dartanian McGee on July 20, 2002 (count 7); and that Marlowe and Ferrell assaulted Larry Clark on September 10, 2002 (count 8). Conatser was acquitted of

counts 4 and 6. The jury found Marlowe guilty of counts 4 through 7, but acquitted him on count 8.[1]

The district court sentenced Conatser to a term of 70 months' imprisonment for the conspiracy conviction. Marlowe was sentenced to life imprisonment on count 3 for the denial of medical care that resulted in Kuntz's death, to run concurrently with the ten-year sentences imposed on each of counts 2, 4, 5, 6, and 7. Conatser and Marlowe appealed.

## B.        Facts

There was considerable evidence that a group of second-shift officers, led by Marlowe, would strike and kick inmates who were loud, obnoxious, or uncooperative and would conceal their unjustified use of force through the denial of medical care and the falsification of incident reports. Marlowe, a young sergeant, was the supervisor of the second shift, from 4:00 p.m. to midnight, during the relevant period. The jail, constructed to house 106 inmates, was chronically overcrowded. For example, on the day that Kuntz was beaten, there were 190 inmates in the jail. The second shift was usually staffed by four to seven corrections officers, none of whom were higher-ranking officers. As the investigation progressed, a number of second-shift officers admitted their own part in these assaults and that they accompanied Marlowe during assaults or stood outside a cell while Marlowe or others committed assaults.

Marlowe led by example and set the tone for other officers. Christopher Finley testified that Marlowe told him that "second shift was a different kind of shift"; that "no reports were done"; and that there was "no talking to higher up individuals unless everything went through him." Travis Bradley testified that on his first night working the second shift, Marlowe beat a "mouthy" drunk and then told Bradley "welcome" to second shift. Bradley also explained how Marlowe would get an uncooperative inmate "gassed up" and ready to fight by making smart remarks, belittling him, or cussing at him.

Marlowe had a penchant for striking inmates hard enough to render them unconscious, and he and other officers kept an oral tally of those assaults that was referred to as the "knock-out list." That "list" ultimately had as many as 21 people on it. In fact, Gary Hale testified that Marlowe instructed him to land his blows in the temple area because it was a "knock-out point." Marlowe and other officers would discuss, recount, and reenact these assaults when they were together. They would not do so, however, if any of the few officers who were not part of the "inner circle" were around. Without recounting all of the details or touching on all of the assaults or acts alleged as overt acts and substantive civil rights violations, we briefly discuss four specific incidents that reflect the nature of the conduct involved and are pertinent to the issues raised on appeal.

### 1.        McIntyre

In the summer of 2001, Kenneth McIntyre was in the booking area using the telephone when he became agitated. He spit at one officer, William Westmoreland, but hit Marlowe instead. Marlowe, Conatser, and another officer named John McKinney immediately removed McIntyre to a holding cell. Westmoreland followed them and observed several officers striking McIntyre in the body. Westmoreland then joined in the assault by hitting McIntyre in the head. Although McIntyre's face was swollen and cut, no incident report was written. Conatser was acquitted of the charge associated with this assault; but Marlowe was convicted.

---

[1] Several other officers pleaded guilty under separate indictments to offenses connected to the conspiracy, including: Travis Bradley for lying about the assault on Armes; William Westmoreland for his participation in the assault on McIntyre; John McKinney for filing a false report about the assault on Clark; and Christopher McCathern for participating in another assault alleged as an overt act.

### 2.    Martinez

Arrested for drunk driving in October 2001, Sergio Martinez was "mouthy" but not physically aggressive or threatening. When Martinez refused to answer questions during booking, Marlowe yelled at him and called him a "sawed-off little bastard." Martinez reciprocated with statements about 9-11, including that he was glad it happened and that he wished he had been one of the pilots so they could have killed more Americans. During the process, Martinez kicked off his boots and one of them hit Conatser. At some point during booking, Marlowe got out a pair of black gloves. Westmoreland took this as a signal that Martinez "was probably going to get beat." Marlowe and Westmoreland escorted Martinez to a detox cell, and Conatser followed but did not go in. While Conatser testified that he returned to the booking area, Westmoreland said Conatser was still outside the cell when they came out.

Once inside the cell, Marlowe punched Martinez in the jaw with his left hand so hard that it rendered Martinez unconscious for five to seven seconds. They waited until Martinez "came to," and then Westmoreland struck him five or more times and Marlowe hit him so many times that Westmoreland said he "couldn't even keep count." Marlowe also kicked Martinez once or twice after he collapsed on the floor. Walking back to booking, Marlowe said he was surprised to have knocked Martinez out with a blow from his left hand. Later that night, Marlowe, Conatser, Westmoreland, and other officers from the second shift talked about the incident in the parking lot and the fact that Martinez was "number 11" on Marlowe's "knock-out list."

Two reports were written by Marlowe and one by Conatser, but Westmoreland was instructed not to write one. Marlowe's reports falsely stated that Martinez was physically aggressive inside the cell, that Conatser threatened Martinez with a chemical agent if he refused to stop hitting the door, and that Martinez was provided basic medical care. Conatser's report did not mention any use of force against Martinez, but stated that Martinez had head-butted the door and was threatened with use of a chemical agent. Medical evidence established that Martinez's right jaw was broken, and that it would not have resulted from a fall or running into a door or wall.

### 3.    Armes

On April 30, 2002, Marlowe was forced off the road by a suspected drunk driver named Paul Armes. Marlowe, who was off-duty at the time, followed Armes, called the authorities, and waited until Armes was under arrest before going on his way. The arresting officer described Armes as uncooperative but not threatening or physically aggressive, and testified that a breathalyzer test showed Armes to have a blood alcohol level of .17.

After booking him, Conatser and Bradley took Armes to the detox cell. According to Bradley, Armes was unsteady on his feet and staggered toward them. While Bradley did not feel threatened by Armes, Conatser testified that he did and reacted by striking Armes once in the face. Bradley then restrained Armes, who did not resist. As Conatser and Bradley left the cell, Conatser realized that he had seriously injured a knuckle. According to Conatser, Armes began banging on the cell door and he went in with another officer named Christopher McCathern. Armes charged McCathern, who forced Armes to the ground and held him there until he calmed down.

Later, Marlowe came to the jail, spoke with Conatser, and went into the cell where Armes was being held. Bradley testified that Marlowe, who appeared "fairly angry," went into Armes's cell from which Bradley could hear yelling and the sound of blows, grunts, and groans. Bradley testified that one could hear the distinctive sounds of blows being struck from the booking desk, which was located approximately 20 feet away from the cell. Marlowe went outside to "cool off," then went back into the cell and resumed yelling and hitting Armes. Bradley then went into the cell

and sprayed Armes with a chemical agent. At some point after Marlowe arrived at the jail, Conatser went to get medical attention for his knuckle.

Marlowe, Conatser, and Bradley wrote reports about the incident. Conatser stated that he avoided an initial punch from Armes and then hit Armes after he continued to "fight and resist." Bradley testified that although his report described Armes as having lunged at him and Conatser, it was more accurate to say that Armes had staggered toward them. Marlowe's report did not mention any use of force. Westmoreland and Hale, neither of whom had been at the jail that night, testified that Marlowe told them about the incident. Specifically, Marlowe told Hale that he called the jail before arriving and told the officers to "handle it" until he got there, and that after the second or third blow he had felt Armes's face "crush" and it "felt like mush." Westmoreland testified that Marlowe said he had "beat the shit" out of Armes for running him off the road. Armes did not receive medical attention at the jail. Evidence at trial showed that Armes's cheekbone was broken in three places, two metal plates were surgically implanted to treat the fractures, and a facial nerve was damaged.

### 4.     Kuntz

On January 13, 2003, Walter Kuntz was involved in a minor automobile accident and was apprehended at a convenience store after leaving the scene. Kuntz struggled briefly with officers during the arrest and complained about an injury to his lip. When Kuntz was brought to the jail at 3:30 p.m., the only injuries noted were a discoloration of his lips and an abrasion to his forehead. It was later estimated that Kuntz's blood alcohol level at the time of his arrest was .26.

Booked without incident, Kuntz was placed in the detox cell. A short while later, Kuntz began screaming and banging on the cell door. Marlowe told him to be quiet, but Kuntz would not. When Marlowe and Finley entered the cell, Kuntz threw a roll of toilet paper at Marlowe. Marlowe punched Kuntz in the left side of his head, threw him toward the wall, and kicked, punched, and kneed Kuntz in the rib area. Kuntz was screaming when they left the cell, but quieted down for about 30 minutes before continuing to bang on the cell door. Finley testified that Marlowe got more agitated, then went back into the cell with Finley and another officer named Donald Willis. Willis testified that Kuntz was standing up, but was not aggressive. Marlowe struck Kuntz in the left temple area, knocking him down, and then punched and kicked Kuntz some more. Willis sprayed Kuntz with a chemical agent as they left the cell.

Kuntz was quiet for a time, but then started to yell and kick the cell door again. Hale testified that at approximately 5:00 p.m., Marlowe told him that he had already hit Kuntz in the head and instructed Hale to "take care of the situation." Hale understood Marlowe to mean that he should do whatever it took to make Kuntz stop beating the door. This time, Hale, Finley, and Willis went into the detox cell. Kuntz backed away, and Hale pushed him onto the bench next to the wall. The right side of Kuntz's head was facing Hale and the left side was four or five inches from the wall. Hale admitted that he delivered three or four "full power" punches to the right side of Kuntz's head. Each time, the left side of Kuntz's head bounced off the wall and made a "cracking sound." The officers left Kuntz holding his head and moaning. Hale told Marlowe that he had "taken care of it."

Willis took a call from Kuntz's mother, who advised him that Kuntz had undergone brain surgery a year or two earlier. Willis told Hale and Marlowe about the call. Hale looked worried, but nothing was done. When Hale returned to the cell at 6:00 p.m. to advise Kuntz of the charges, Kuntz was conscious but did not respond to Hale. Between 7:00 and 7:30 p.m., Hale returned and found Kuntz lying on the bench, "passed out" in his own vomit. Marlowe and Hale had an inmate clean Kuntz up and turn him so he would not choke if he vomited again. Kuntz was not responsive, but no medical attention was ordered. Marlowe testified that he thought Kuntz was extremely drunk and might have taken some pills.

Between 8:45 and 9:00 p.m., Hale went into the cell and found that Kuntz had vomited again. Hale and Marlowe cleaned him up and tried to rouse him by shaking him, patting him, and pouring a bucket of ice water over him. Kuntz did not move or show any signs of consciousness. Hale and Marlowe used ammonia smelling salts, which did not rouse him. They noticed that Kuntz would stop breathing until the salts were taken away. No steps were taken to get medical care at that time.

In the next hour, Willis checked on Kuntz and found him lying down with his eyes open. Kuntz did not respond to being shaken or having a light shone in his eyes. Willis alerted Marlowe, but nothing was done. At 10:00 p.m., Hale suggested that they call his father, who was a judicial commissioner[2] and had some EMT experience. Marlowe agreed. Hale's father arrived at approximately 11:00 p.m., and recommended that they call an ambulance. At that time, Hale told Finley not to worry about writing a report because he and Marlowe would take care of it.

When the ambulance arrived a little after 11:30 p.m., the EMTs evaluated Kuntz and determined that he was a level three on the level of consciousness scale—the same level as a deceased person. The EMTs had been dispatched for a case of possible alcohol poisoning, and neither Marlowe nor Hale told the EMTs or Hale's father that Kuntz had received repeated blows to the head. There was evidence that if the EMTs had known that Kuntz might have a head injury, he would have been airlifted directly to a trauma center. Instead, Kuntz went to a local medical center. Upon examination, doctors noted that Kuntz was wet and his body temperature was ten degrees below normal. After a brain scan, Kuntz was then flown to a trauma center.

A neurosurgeon evaluated Kuntz, who was on a ventilator and had no brain stem reflexes. The doctor concluded that Kuntz had a very large subdural hematoma that had caused irreversible brain damage. He added that Kuntz's low body temperature had exacerbated his condition because it interfered with normal clotting. Kuntz died when he was removed from the ventilator two days later.[3]

Several doctors testified at trial that Kuntz's head injuries were consistent with blunt force trauma, and that such injuries are generally treatable if medical attention is sought in the first hours after a brain injury. It was also explained that within an hour of injury a person with a subdural hematoma would start to experience a progression of symptoms such as dizziness, headache, nausea, vomiting, sleepiness, lethargy, and eventually unresponsiveness.

## II.

In reviewing the denial of Conatser's motions for judgment of acquittal, Fed. R. Crim. P. 29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making this determination, "we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994). All reasonable inferences must be drawn in favor of the jury's verdict. *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001).

The record reveals ample evidence from which the jury could find the existence of the charged conspiracy. *United States v. Epley*, 52 F.3d 571, 575-76 (6th Cir. 1995). No proof of a formal agreement is required to establish a conspiracy to violate federal law; "a tacit or mutual

---

[2]Judicial commissioners sign warrants, set bail, and perform other administrative tasks.

[3]Autopsy revealed that Kuntz also had three broken ribs, contusions and abrasions to his abdomen and back, and a bruised scrotum.

understanding among the parties will suffice." *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989). Indeed, Conatser does not deny the existence of the conspiracy—only his connection to it. Just as the conspiracy may be inferred from circumstantial evidence, a defendant's knowledge of and participation in a conspiracy also may be inferred from his conduct and established by circumstantial evidence. *Id.*; *Salgado*, 250 F.3d at 447. Once a conspiracy is established beyond a reasonable doubt, a particular defendant's connection to the conspiracy "need only be slight." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997).

We conclude that there was sufficient evidence from which a reasonable trier of fact could conclude that Conatser joined the conspiracy to violate the civil rights of inmates at the jail. Three coconspirators, Hale, Bradley, and Westmoreland, each testified that Conatser was among those second-shift officers who would accompany Marlowe into a cell or stand outside the cell while Marlowe committed unjustified assaults on loud, obnoxious, or uncooperative inmates. In fact, there was evidence that Conatser followed Marlowe and Westmoreland as they took Martinez to the detox cell and stood outside while Martinez was assaulted. It was alleged as an overt act of the conspiracy that Conatser falsified a report relating to the incident. Conatser's report related Martinez's refusal to cooperate during booking and his comments about the 9-11 terrorist attack, but omitted Marlowe's use of force and stated that Martinez "head-butted" the door three to five minutes after being escorted to the detox cell. That Conatser joined the conspiracy may also be inferred from evidence that he was included in the group of officers who gathered to talk and joke about the assaults and the "knock-out list." Westmoreland testified that several other second-shift officers were not part of the inner group and were not included in these discussions because they were not trusted.

Minimizing this evidence, Conatser argues that Hale, Bradley, and Westmoreland were cooperating witnesses whose testimony should not be believed. In all, these arguments boil down to a challenge to the credibility of these witnesses framed as a challenge to the sufficiency of the evidence. *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999). "Attacks on witness credibility are simple challenges to the quality of the government's evidence and not the sufficiency of the evidence." *United States v. Sanchez*, 928 F.2d 1450, 1457 (6th Cir. 1991). We may not reweigh the evidence or assess credibility in determining the sufficiency of the evidence, but must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *Salgado*, 250 F.3d at 446.

Arguing that his conviction was nothing more than an instance of guilt by association, Conatser relies heavily on his acquittal of the two substantive offenses arising out of the assaults against McIntyre and Armes. To the extent that Conatser is arguing that his acquittal of the only assaults in which he was specifically alleged to have participated was inconsistent with his conviction for the conspiracy, it is clear that "a defendant may not upset a verdict solely because the verdict is not reconcilable with other verdicts rendered for or against the defendant." *United States v. Silva*, 846 F.2d 352, 357-58 (6th Cir. 1988); *see also United States v. Powell*, 469 U.S. 57, 64-65 (1984); *Dunn v. United States*, 284 U.S. 390, 393 (1932). Nor was it necessary to prove that Conatser committed one of the charged overt acts because even when proof of an overt act is required—as is the case for conviction under 18 U.S.C. § 371—that burden is satisfied by proof that *at least one* of the alleged overt acts was committed by *any one* of the coconspirators. *United States v. Kirk*, 584 F.2d 773, 782 (6th Cir. 1978). Here, any such requirement would have been satisfied by Marlowe's conviction on six of the seven substantive counts that were also charged as overt acts.[4]

---

[4] For this reason, we need not decide whether conspiracy to violate the civil rights of another requires proof of an overt act. Although the Supreme Court has not decided this issue, several circuits have faced the issue head on and concluded that, like the drug conspiracy statute at issue in *United States v. Shabani*, 513 U.S. 10, 13 (1994), there is no overt act requirement for proof of conspiracy in violation of 18 U.S.C. § 241. *See*, *e.g.*, *United States v. Colvin*, 353

Moreover, while the acquitted conduct was included among the overt acts, the jury's verdicts were not inconsistent because the conspiracy was broader than the substantive offenses based on the assaults of McIntyre and Armes. *United States v. Crochiere*, 129 F.3d 233, 239 (1st Cir. 1997). Conviction for conspiracy did not require proof that Conatser assaulted a particular inmate without justification, only that he joined in the conspiracy that had such assaults as one of its objects. We find there was sufficient evidence from which a reasonable juror could conclude Conatser was a member of the conspiracy, and therefore affirm his conviction on count 1.

### III.

Sentences imposed post-*Booker* are reviewed for procedural and substantive reasonableness. *United States v. Booker*, 543 U.S. 220, 261 (2005); *United States v. Williams*, 432 F.3d 621, 623 (6th Cir. 2005). Appellate courts must "first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 128 S. Ct. 586 (2007); *see also* 18 U.S.C. § 3553(a).

If procedurally sound, we review the substantive reasonableness of the sentence under an abuse-of-discretion standard. *Id.* at *6; *see also Rita v. United States*, 127 S. Ct. 2456, 2465 (2007). As we have recognized and *Rita* made explicit, reasonableness is an appellate standard of review. *United States v. Wilms*, 495 F.3d 277, 280-82 (6th Cir. 2007); *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006). A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor. *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005), *cert. denied*, 546 U.S. 1126 (2006).

A properly calculated advisory guidelines range represents the starting point for substantive-reasonableness review because it is one of the § 3553(a) factors and because the guidelines purport to take into consideration most, if not all, of the other § 3553(a) factors. *Gall*, 128 S. Ct. at 596 ("[T]he Guidelines should be the starting point and the initial benchmark."). The sentencing judge may not presume that the guidelines range is reasonable, but must consider all of the relevant § 3553(a) factors and impose a sentence that is "sufficient but not greater than necessary" to comply with the purposes of § 3553(a)(2). *Foreman*, 436 F.3d at 644 n.1. A properly calculated within-guidelines sentence will be afforded a rebuttable presumption of reasonableness on appeal. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 3043 (2007); *see also Rita*, 127 S. Ct. at 2462. At the same time, a sentence falling outside the guidelines range is not presumptively *un*reasonable. *United States v. Ferguson*, 456 F.3d 660, 664 (6th Cir. 2006).

### A.        Conatser's Sentence

The district court determined Conatser's base offense level pursuant to United States Sentencing Guidelines (USSG) § 2H1.1(a)(1) (2005), which cross-referenced the guideline applicable to any underlying offense. Holding Conatser responsible for the assault of Martinez (as relevant conduct), the offense level was borrowed from the guidelines for aggravated assault. USSG § 2A2.2(a). The base offense level of 14 was increased by five levels because the victim sustained serious bodily injury, USSG § 2A2.2(b)(3)(B); by six levels because the offense was committed

---

F.3d 569 (7th Cir. 2003); *United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000); *United States v. Crochiere*, 129 F.3d 233, 237-38 (1st Cir. 1997). *But see United States v. Brown*, 49 F.3d 1162, 1165 (6th Cir. 1995) (mentioning overt act requirement in dicta).

under color of law, USSG § 2H1.1(b)(1)(B); and by two levels because the victim was physically restrained in the cell during the offense, USSG § 3A1.3.[5]  With a total offense level of 27 and a criminal history score of 0, the sentencing judge determined the advisory guidelines range to be 70 to 87 months.

Conatser argued for a below-guidelines sentence, presented considerable evidence in support of that request, and made a statement at sentencing.  The district judge recognized the advisory nature of the guidelines, indicated that he considered all of the relevant § 3553(a) factors, and denied the request for a downward variance from the guidelines range.  In doing so, the district judge explained that "it wouldn't reflect the seriousness of the offense that the jury has found and wouldn't afford adequate deterrence."  The judge also added that the absence of any prior criminal history made a sentence at the bottom of the guidelines range appropriate.  Without contesting the guidelines calculations, Conatser argues that the sentence was unreasonable because the district judge did not discuss or give appropriate weight to several § 3553(a) factors.  The essence of this argument is that the district judge failed to give sufficient weight to his mitigating evidence, which is a challenge to the substantive reasonableness of his sentence.

First, echoing his arguments concerning the sufficiency of the evidence, Conatser argues that the district judge did not give sufficient weight to "the nature and circumstances of the offense." 18 U.S.C. §  3553(a)(1).  That is, Conatser argues the sentence was too harsh because there was no direct evidence, other than acquitted conduct, that he assaulted or participated in the assault of any specific inmate in violation of the inmate's civil rights.  On the contrary, we find that the district court properly focused on the fact that the conviction was for conspiracy and determined the offense level based on the foreseeable assault of Martinez in violation of his civil rights.  This determination, taken with the color-of-law and victim-restraint enhancements, represented appropriate consideration of the nature and relative seriousness of Conatser's conduct.

Next, with respect to the "history and characteristics of the defendant," § 3553(a)(1), defendant argues that he should have received a lesser sentence because he had no criminal history and was a "pillar of his community."  Conatser presented testimony from friends, family, clergy and others who described him variously as decent, caring toward others, giving of his time, hard-working, and religious.  The district judge also received and reviewed 135 letters of support that had been submitted on Conatser's behalf prior to sentencing.  There can be no doubt that the plea for leniency on the grounds of Conatser's otherwise good character was presented and fully considered, and the absence of any prior criminal history was cited as the reason for selecting a sentence at the bottom of the advisory guidelines range.  We find that it was not unreasonable for the district judge who heard all the evidence at trial to conclude that this factor did not warrant a below-guidelines sentence.

Finally, Conatser argues that the district court did not adequately consider the need to avoid unwarranted sentencing disparities.  Conatser did not raise the issue at sentencing, and, in fact, the government argued that this factor weighed in favor of a sentence at the top of the guidelines range. Section 3553(a)(6) identifies as one of the sentencing factors to be considered "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  We have explained, however, that this factor concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between codefendants. *United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007); *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir. 1991).  Since there was no suggestion that

---

[5]The district court sustained the defendant's objection to an enhancement for obstruction of justice, but denied all other objections to the guidelines calculation.

national uniformity in sentencing was of particular concern in this case, the district judge could but was not required to consider disparities between codefendants. *Simmons*, 501 F.3d at 626.

The focus of Conatser's contention was the comparison of his sentence to the probationary sentences that Bradley and Westmoreland received, and the proportionally light sentence of 108 months that Hale received despite his direct involvement in the conduct that led to Kuntz's death. Disparities between the sentences of coconspirators can exist for valid reasons, such as differences in criminal histories, the offenses of conviction, or one coconspirator's decision to plead guilty and cooperate with the government. *United States v. Dexta*, 470 F.3d 612, 616 n.1 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 3066 (2007); *United States v. Nelson*, 918 F.2d 1268, 1275 (6th Cir. 1990). This is just such a case, as Bradley and Westmoreland each cooperated with the government and pleaded guilty to a different offense under a separate indictment. Hale's sentence, although greater than Conatser's, was much lower than it might have been if he had not pleaded guilty to the conspiracy count, which carried a maximum penalty of ten years' imprisonment. *See also Gall*, 128 S. Ct. at 599 (noting that because the guidelines take into consideration the need to avoid unwarranted disparities, consideration of the properly calculated guidelines range necessarily entailed consideration of the need to avoid unwarranted disparities under § 3553(a)(6)).

Accordingly, we find that it was not unreasonable for the district court to sentence Conatser at the bottom of the guidelines range.

## B.     Marlowe's Sentence

Marlowe appeals only from the life sentence imposed on count 3, and does not challenge the decision to sentence him to the statutory maximum of 10 years' imprisonment on each of counts 1, 2, 4, 5, 6, and 7. Marlowe faced a sentence that included life imprisonment because the jury found that Marlowe's denial of necessary and appropriate medical care to Kuntz resulted in his death. As with Conatser, the applicable sentencing guideline for civil rights violations required that the district court apply the base offense level applicable to any underlying offense. USSG § 2H1.1(a) (2002).[6] There is no dispute that, unlike Conatser, the underlying offense was homicide and the critical determination was whether to apply the base offense level from the guideline applicable to second degree murder, USSG § 2A1.2, or the substantially lower base offense level applicable to involuntary manslaughter, USSG § 2A1.4. The district judge explained that, in his view, the record reflected malice aforethought and culpability for second degree murder.

After determining the base offense level to be 33, the district court added six levels because the offense was committed under color of law, USSG § 2H1.1(b)(1)(B); two levels because the victim was restrained in a cell at the time of the offense, USSG § 3A1.3; four levels because Marlowe was an organizer or leader, USSG § 3B1.1(a); and two levels for obstruction of justice by providing materially false information to authorities investigating Kuntz's death, USSG § 3C1.1. With a total offense level of 47 and a criminal history score of 0, the corresponding guidelines sentence was not a sentencing range but a term of life imprisonment. After receiving testimony from a number of witnesses, the district court addressed the relevant § 3553(a) sentencing factors, denied Marlowe's request for a below-guidelines sentence, and sentenced Marlowe to life imprisonment on count 3. We turn to Marlowe's specific claims on appeal.

---

[6]Unlike Conatser, Marlowe's recommended guidelines sentence was determined using the 2002 edition of the Guidelines Manual to avoid *ex post facto* concerns arising from subsequent amendments that increased the base offense levels for both second degree murder and involuntary manslaughter. *Miller v. Florida*, 482 U.S. 423, 430 (1987); *United States v. Davis*, 397 F.3d 340, 346 (6th Cir. 2005).

1.        **Guidelines Calculation**

We begin with Marlowe's challenge to the guidelines calculation—which is a component of the procedural-reasonableness review. Specifically, Marlowe maintains that facts do not support the conclusion that the underlying homicide offense—that is, causing Kuntz's death by denying him medical care—involved the "malice aforethought" that distinguishes second degree murder from manslaughter under federal law. The district judge's interpretation of the guidelines is reviewed *de novo*, while his findings of fact are reviewed for clear error. *United States v. Canestraro*, 282 F.3d 427, 431 (6th Cir. 2002).

"Murder is the unlawful killing of a human being with malice aforethought," while "[m]anslaughter is the unlawful killing of a human being without malice." 18 U.S.C. §§ 1111(a) and 1112(a). Involuntary manslaughter is further defined as an unlawful killing either "[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." 18 U.S.C. § 1112(a). Malice aforethought may be inferred when the defendant "grossly deviates from the standard of care to such an extent that a jury could conclude that he must have been aware of a serious risk of death or serious bodily injury." *United States v. Sheffey*, 57 F.3d 1419, 1430 (6th Cir. 1995); *see also United States v. Milton*, 27 F.3d 203, 206 (6th Cir. 1994).

Marlowe argues that he was performing a lawful action when "attempting to revive Kuntz," and that his conduct amounted to, at most, criminal negligence or reckless manslaughter. In support of the claim that he was not aware of a serious risk of death or serious bodily injury, Marlowe insists that he did not know that Hale had struck Kuntz in the head. The evidence showed, however, not only that Marlowe himself had beat Kuntz twice—striking him in the head both times—but also that Marlowe had asked Hale to "take care of" Kuntz when he started banging on the door again. Hale understood this to mean that he should use whatever force it took to make Kuntz stop banging on the door, and proceeded to deliver several full-powered punches to the side of Kuntz's head that caused his head to bounce against the concrete wall each time. Hale reported to Marlowe that he had "taken care of it," and Kuntz was quiet after that. Although not present during the assault by Hale, Marlowe would have known from prior experience that Hale had silenced Kuntz by beating him. Not long after Hale assaulted Kuntz, Marlowe and Hale were told that Kuntz had undergone brain surgery within the last year or two. Nonetheless, Marlowe emphasizes his lack of medical training and claims that he thought Kuntz's condition was due to severe intoxication. The evidence at trial was that symptoms of extreme intoxication are similar to the symptoms of a subdural hematoma.

There is no dispute that Kuntz was severely intoxicated when he arrived at the jail at 3:30 p.m., and it was estimated that his blood alcohol level at that time was .26. Between then and 5:00 p.m., however, Kuntz was assaulted three times. When checked at 6:00 p.m., Kuntz was awake but not did not respond to Hale; by 7:00 or 7:30 p.m., Kuntz had vomited on himself and could not be roused; by 9:00 p.m., Kuntz had vomited again and was so nonresponsive that he could not be roused by being doused with ice water or with the use of smelling salts; and before 10:00 p.m., Kuntz was found lying with his eyes open and did not respond when a flashlight was shone in his eyes. Despite being aware of his worsening condition and knowledge of the assaults that preceded it, no medical attention was sought or provided until after Marlowe agreed to call Hale's father. Even then, neither Marlowe nor Hale mentioned to Hale's father or the EMTs who responded to the jail that Kuntz might have hit his head, which further delayed appropriate evaluation and treatment. There was evidence that a subdural hematoma can generally be treated successfully within several hours after a head injury. Kuntz, however, suffered irreversible brain damage and died.

It was not clearly erroneous for the district judge to conclude that Marlowe's conduct so grossly deviated from a reasonable standard of care that he must have been aware of a serious risk

of death or serious bodily injury. *Accord United States v. McDougle*, 82 F. App'x 153 (6th Cir. 2003) (upholding use of base offense level for second degree murder in calculating the guidelines sentence on a conviction for violation of civil rights resulting in death).[7] As such, it was not error to draw the base offense level from the guideline applicable to second degree murder.

### 2.     Reasonableness

Aside from the above challenge to the guidelines calculation, Marlowe also argues that his sentence was procedurally unreasonable because the district judge neglected to consider the other § 3553(a) factors and did not articulate the reasons for imposing the life sentence. Procedural reasonableness does not require ritual incantation of the other § 3553(a) factors by the district judge as long as the record demonstrates the district court's consideration of the relevant factors, *Williams*, 436 F.3d at 709. That is, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising its own legal decisionmaking authority." *Rita*, 127 S. Ct. at 2468.

We find, as the following excerpt from the sentencing hearing reveals, that Marlowe's argument on this score is misplaced. The district judge explained as follows:

> The Court also has to consider the request for sentence outside the guideline range. In that, the Court has to order a sentence that's sufficient but not greater than necessary. [It] has to consider the nature and circumstances of the offense, the history and characteristics of the defendant. The sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment, provide adequate deterrence, protect the public, [and] provide needed educational vocational training and medical care. [It h]as to consider the kinds of sentences available, the advisory guideline range and guideline policy statements and avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. And to provide restitution.
>
> Mr. Marlowe has relied on the following grounds, as I understand them. That the circumstances at the Wilson County Jail were overcrowded, too few guards and lack of training. He is relying on his youth and inexperience and lack of training. He is relying on the fact that he is esteemed by his friends, and that's reflected in 33 letters of support and 893 signatures on the petition that was submitted to the Court.
>
> He is relying on his lack of criminal record, his family ties and responsibility. Has a young wife and young son. He argues a life sentence is too drastic. That his actions were tacitly approved by his supervisors. Inmates were aggressive. He is unlikely to repeat the offense or be able to. He's otherwise had an exemplary life. He's been rehabilitated. And he also argues that his status as a former jailer makes his conditions of confinement especially harsh. He raises the disparity with the 108-month sentence for Gary Hale and generally the totality of the circumstances.
>
> The Court has heard from a number of witnesses today. We have had testimony from family members, his wife, his brother [who the defendant cared for through 25 surgeries], his father, [and] his sister-in-law about his character and

---

[7]In *McDougle*, as part of a conspiracy to use beatings to obtain compliance from mentally retarded and physically impaired residents of a state facility, one resident was struck repeatedly in the chest and abdomen. Although the resident became visibly ill during the day, the defendants did not apprise the nursing staff of the assault. The resident was misdiagnosed with a gastrointestinal ailment and died that night from internal bleeding resulting from blunt force trauma to the abdomen.

family ties and other matters. Had three witnesses really speak to the rehabilitation issue, his pastor and assistant pastor, [and] neighbor. And then we have had intermittent testimony about lack of training and lack of proper guidance at the facility.

And the Court has also heard from the Kuntz family, Ms. Thompson and the two Mrs. Whites, about the impact on their family.

In the view of the Court, most of the heart-wrenching aspects of this case are not appropriate reasons to go outside the guideline range. It is a family tragedy to both the Marlowes and the Kuntz[es] that's heart breaking. It is difficult to hear. Takes a piece out of you every time you hear a case like this, but regrettably the terrible family consequences are a usual rather than an unusual consequence of criminal conduct. The Court has considered it, but it is not something that outweighs the criminal conduct engaged in by Mr. Marlowe.

Also considered the other factors that have been argued. Some have more merit than others. I do think that lack of criminal history and lack of training are particularly strong to be considered.

The factor I am most concerned about and have weighed along with all the others is concern that there not be sentencing disparity with Mr. Hale. Mr. Hale received 108 months [imprisonment] from the Court. And the basic reason for that is Mr. Hale pled guilty to Count One that had a ten-year maximum . . . [and] received a downward adjustment in light of his cooperation for 108 months sentence rather than 120-month sentence.

And that concerns me . . . because in the view of the Court, Mr. Marlowe beat Mr. Kuntz. Mr. Hale then . . . killed Mr. Kuntz with his bare hand. But Mr. Marlowe allowed Mr. Kuntz to die through no intervention, and that's supported by the jury's verdict on Count Three. So the Court is mindful of that really Mr. Hale is very culpable in the death of Mr. Kuntz. Mr. Marlowe is culpable as well. And got to balance all of that. I have looked back at Mr. Hale's presentence report and the judgment that the Court entered. And Mr. Hale would have had offense level of 40, very long guideline range of 292 to 365 months but for the statutory maximum [on Count One.]

There are dissimilarities between Mr. Hale and Mr. Marlowe. Mr. Marlowe was a supervisor. Mr. Marlowe was convicted of seven counts, not one. There was substantially more evidence at trial about Mr. Marlowe abusing other inmates. So they are not really similarly situated, . . . but I have satisfied myself that that's not an unwarranted sentencing disparity under the totality of the circumstances. . . .

So where does that put me? It is admittedly a difficult case and a hard decision, but I am going to deny the request for sentence below the advisory guideline range. I think on balance the guideline sentence of life is the appropriate sentence considering 3553 and the guidelines.

This brings us to Marlowe's claim that the sentence was substantively unreasonable.

As noted earlier, the properly calculated guidelines recommendation of life imprisonment is the starting point for our substantive-reasonableness review, and a within-guidelines sentence is entitled to a rebuttable presumption of reasonableness. *Williams*, 436 F.3d at 708. Marlowe contends that his sentence is unreasonable because the district judge failed to give adequate weight

to the "nature and circumstances of the offense," the "history and characteristics of the defendant," and "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a).

Taking the last first, it is clear from the record that the district judge exercised his discretion and gave significant consideration to the difference between Hale's sentence of 108 months and the prospect of a life sentence for Marlowe. Marlowe contends that because he and Hale were similarly situated, the district court should have given the advisory guidelines less weight to avoid this substantial disparity in sentencing. As the district judge ably explained, although it was Hale who inflicted the injuries that would kill Kuntz, the jury found that Marlowe's actions in denying Kuntz necessary and appropriate medical care resulted in his death. While the disparity was the product of the plea bargain and downward departure Hale received, a coconspirator's decision to plead guilty and cooperate with the government may be a valid reason for such sentencing disparity. In addition, the district judge explained that Marlowe and Hale were not similarly situated in several important respects. On this record, we find that it was not unreasonable to conclude that the disparity in sentences between Marlowe and Hale did not justify a below-guidelines sentence.

With respect to the other factors, Marlowe contends that the district judge failed to give adequate weight to the mitigating facts relevant to the "nature and circumstances of the offense" and the "history and characteristics of the defendant." Specifically, Marlowe argues that a lesser sentence was warranted by the fact that he was "a young, misguided boy who was not mentally prepared for a job as a correctional officer"; that the jail was overcrowded, underfunded, and understaffed; that he did not receive proper training or supervision; and that he followed the example of others and "performed as he thought was expected." In addition to these "circumstances," family, friends, and neighbors testified at sentencing that Marlowe was a family man who, among other things, generously cared for a brother with scoliosis through 25 surgeries, was the primary caregiver to his young son while his wife completed college, and contributed his time and talents to work with children and teens. Letters and petitions of support were received and considered by the district judge, as was the testimony concerning the counseling Marlowe underwent prior to trial that was described as having led to a "genuine transformation" and sincere expressions of remorse.

We find that the arguments and evidence with respect to Marlowe's plea for a lesser sentence were fully before the district judge, and were expressly noted and considered. Explaining that the case was "difficult" and presented a "hard decision," the district judge nonetheless believed that the "heart-wrenching" circumstances did not warrant a below-guidelines sentence. Ultimately, the district judge concluded that "on balance the guideline sentence of life is the appropriate sentence considering [§] 3553 and the guidelines." Having properly considered and weighed the competing reasons for leniency and for a harsh penalty, the district judge made a reasonable determination as to the appropriate sentence in light of the purposes of § 3553(a). *United States v. Collington*, 461 F.3d 805, 810 (6th Cir. 2006). The sentence, while indeed harsh, is not substantively unreasonable. *Webb*, 403 F.3d at 385.

### 3.    Constitutional Claims

Last, but not least, Marlowe seeks reversal of his life sentence on the grounds that it was unconstitutionally imposed in violation of the Fifth and Sixth Amendments. Since there seems to be no dispute that Marlowe raised these objections at sentencing, we will review the constitutionality of this sentence *de novo*. *United States v. Beverly*, 369 F.3d 516, 536 (6th Cir. 2004).

Marlowe argues first that his sentence was unconstitutional because it was based on a fact not admitted by him or found by the jury. Specifically, it is the finding that Marlowe's conduct

involved the "malice" required for second degree murder and the attendant increase in the guidelines' recommended sentence that is challenged.[8]

As *Blakely* made clear, the relevant maximum in this regard "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004). It is true, as Marlowe argues, that *Booker* applied *Blakely* to the federal sentencing guidelines and held that it would violate the Sixth Amendment to increase a defendant's sentence based on judicially found facts under the then-mandatory sentencing guidelines scheme. *United States v. Booker*, 543 U.S. 220, 233 (2005). The remedy adopted in *Booker*, however, was to render the guidelines advisory. *Id*. at 246-49. Where, as here, the district court recognized the advisory nature of the guidelines, the increase in a defendant's sentence based on facts not admitted by the defendant or proven to a jury beyond a reasonable doubt does not violate the Sixth Amendment. *United States v. Kosinski*, 480 F.3d 769, 775 (6th Cir. 2007). In other words, "*Booker* did not eliminate judicial factfinding." *United States v. Coffee*, 434 F.3d 887, 898 (6th Cir.), *cert. denied*, 126 S. Ct. 2313 (2006); *see also United States v. Gardiner*, 463 F.3d 445, 461 (6th Cir. 2006); *United States v. Cook*, 453 F.3d 775, 777 (6th Cir. 2006). Nor are we persuaded that the Supreme Court's application of *Blakely* and *Booker* to California's determinate sentencing law in *Cunningham v. California*, 127 S. Ct. 856 (2007), requires a contrary conclusion.[9]

Relatedly, Marlowe argues that, although the issue was not decided in *Booker*, the Fifth and Sixth Amendments require that judicially found facts must be established beyond a reasonable doubt. This argument is foreclosed by this court's holding that "judicial fact-finding in sentencing proceedings using a preponderance of the evidence standard post-*Booker* does not violate either Fifth Amendment due process rights, or the Sixth Amendment right to trial by jury." *United States v. Gates*, 461 F.3d 703, 708 (6th Cir.), *cert. denied*, 127 S. Ct. 602 (2006); *see also United States v. Moncivais*, 492 F.3d 652, 655 (6th Cir.), *cert. denied*, 128 S. Ct. 633 (2007).

Finally, it is argued that application of a presumption of reasonableness renders the sentence unconstitutional because it lends the guidelines a heightened status not contemplated by *Booker* and impermissibly shifts the burden of proof to the defendant. Although Marlowe seems to argue that the presumption was applied by the district court at sentencing, the record belies such a claim. Defendant objected on that basis, and the district court specifically stated that it would afford the guidelines no presumption of reasonableness. Moreover, our precedents are clear that the presumption of reasonableness recognized in this circuit is an appellate standard of review, which the Supreme Court has held does not violate the Sixth Amendment. *Rita*, 127 S. Ct. at 2463. The Court in *Rita* explained that the presumption, unlike a "a trial-related evidentiary presumption," "reflects the fact that, by the time an appeals court is considering a within-guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case." *Id*.; *see also United States v. Liou*, 491 F.3d 334, 337 (6th Cir. 2007). Marlowe has not shown that his sentence was unconstitutionally imposed.

---

[8] Given the jury's finding that his conduct resulted in Kuntz's death, the statutory enhancement of the penalty to a maximum of life imprisonment did not violate *Apprendi*. *See Apprendi v. New Jersey*, 530 U.S. 466, 489 (2000).

[9] *Cunningham* involved California's sentencing law under which an upper term, or higher tier, sentence could be imposed only when the trial judge found an aggravating circumstance that was not charged or essential to the jury's finding of guilt. The Court rejected the attempt to equate California's law to the post-*Booker* advisory guidelines scheme, but suggested that California could modify their system to either have juries determine statutory sentencing enhancements or to permit judges to genuinely exercise broad discretion within a statutory range "which 'everyone agrees,' encounters no Sixth Amendment shoal." *Cunningham*, 127 S. Ct. at 871.

**IV.**

For the reasons set forth above, we **AFFIRM** Conatser's conviction and **AFFIRM** the sentences of both Conatser and Marlowe.

---

**CONCURRING IN PART AND CONCURRING IN THE JUDGMENT**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and concurring in the judgment. I join the majority opinion in most respects, but I write separately because I believe that the majority gives inadequate attention to Marlowe's argument that his sentence of life imprisonment violates the Sixth Amendment because judge-found facts triggered a substantial increase in his advisory Guidelines range. Although I do not believe that Marlowe's sentence violates the Constitution, his claim deserves a more detailed analysis than it received in the majority opinion. Therefore, I concur in the judgment upholding Marlowe's sentence.

The Supreme Court has summarized its recent Sixth Amendment sentencing jurisprudence as examining "whether the law *forbids* a judge to increase a defendant's sentence *unless* the judge finds facts that the jury did not find (and the offender did not concede)." *Rita v. United States*, 127 S. Ct. 2456, 2466 (2007). The crux of Marlowe's constitutional claim is that his sentence violated the Sixth Amendment because, as a practical matter in his case, the district court could not have imposed a sentence of life imprisonment *unless* the court made the factual finding that Marlowe's conduct so grossly deviated from a reasonable standard of care that he must have been aware of a serious risk of death or serious bodily injury—the mens rea necessary to apply the base offense level for second-degree murder in calculating Marlowe's Guidelines range. Had the district court not made the factual finding that Marlowe's conduct amounted to second-degree murder, it appears that the facts found by the jury would have produced a Guidelines range between 210 and 262 months (seventeen and a half years to nearly twenty two years).[1] Marlowe's contention is that, had the district court imposed a sentence of life imprisonment in a case involving a Guidelines range of 210 to 262 months, we surely would have reversed and held the sentence to be substantively unreasonable. Echoing the language of *Rita*, Marlowe argues that, due to the likelihood that we would have reversed a variance of life imprisonment from a Guidelines range of 210 to 262 months, the district court here was in fact *forbidden* from sentencing Marlowe to life imprisonment *unless* the court found that Marlowe's conduct amounted to second-degree murder.

To resolve Marlowe's as-applied Sixth Amendment challenge requires answering the following question: assuming the district court had not made the second-degree-murder factual finding and that Marlowe's Guidelines range was 210 to 262 months, would the district court's analysis of the 18 U.S.C. § 3553 sentencing factors support an upward variance to a sentence of life imprisonment? That is, instead of finding that Marlowe committed second-degree murder as part

---

[1]As the majority notes, the district court used the 2002 edition of the Guidelines Manual to avoid *ex post facto* concerns in light of amendments raising the base offense levels for second-degree murder and involuntary manslaughter. Maj. Op. at 10 n.6. Marlowe was convicted of several charges of violating 18 U.S.C. § 242 and conspiring to violate § 242, which prohibits the deprivation of another's rights under color of law. The Guideline applicable to § 242, U.S.S.G. § 2H1.1(a)(1), directs the sentencing court to apply the base "offense level from the offense guideline applicable to any underlying offense" if it is greater than certain specified levels. The district court made the factual finding necessary to apply the Guideline for second-degree murder, which produced a recommended Guidelines sentence of life imprisonment. Had the judge used only the jury verdict, however, the greatest base offense level in this case appears to be that for aggravated assault, § 2A2.2, which is 15. Further, a two-level increase for "more than minimal planning" appears proper given the jury's finding that Marlowe was guilty of count III, which alleged that Marlowe and a co-defendant failed to provide necessary and appropriate medical care to a jail inmate they had beaten. *See* U.S. SENTENCING GUIDELINES MANUAL § 2A2.2 cmt. n.3 (2002) ("'[M]ore than minimal planning' means more planning than is typical for commission of the offense in a simple form."). Likewise, the six-level increase pursuant to § 2A2.2(b)(3)(C) for causing "Permanent or Life-Threatening Bodily Injury" is appropriate because the jury convicted Marlowe of causing an inmate's death. The jury verdict thus produces a base offense level of 23. When combined with 14 points from undisputed enhancements, Appellant Reply Br. at 5, Marlowe's offense level would have been 37, resulting in a Guidelines range of 210 to 262 months given his criminal history score of zero.

of the Guidelines calculation, had the district court chosen to vary upward from the 210 to 262-month Guidelines range established by the jury's verdict, would I vote to affirm or reverse Marlowe's sentence of life imprisonment? As explained in further detail below, because the facts found by the jury in this case reveal crimes of a thoroughly depraved and heinous nature, I would have affirmed the imposition of a life sentence for Marlowe even as an upward variance from a Guidelines range of 210 to 262 months. Before analyzing Marlowe's claim, however, I will provide a brief overview of the Supreme Court's recent decisions suggesting that as-applied Sixth Amendment challenges might prove successful in cases similar to Marlowe's.

## I. AS-APPLIED SIXTH AMENDMENT CHALLENGES TO SENTENCES

In *Rita*, the Supreme Court permitted the use of a non-binding, appellate presumption of reasonableness to within-Guidelines sentences, but the Court noted Rita's argument that according a presumption of reasonableness to a within-Guidelines sentence that depended upon substantial judicial fact-finding "raises Sixth Amendment 'concerns.'" *Rita*, 127 S. Ct. at 2465. In his concurring opinion, Justice Scalia elaborated upon those concerns, arguing that review for substantive reasonableness using even advisory Guidelines "will inevitably [produce] *some* constitutional violations . . . because there will be some sentences that will be upheld as reasonable only because of the existence of judge-found facts." *Id.* at 2478 (Scalia, J., concurring).

Justice Scalia offered two hypothetical cases to illustrate this argument, the second of which bears some resemblance to Marlowe's case. Justice Scalia referred to "the common case in which the district court imposes a sentence *within* an advisory Guidelines range that has been substantially enhanced by certain judge-found facts." *Id.* at 2477 (Scalia, J., concurring). Justice Scalia observed that if a defendant with a criminal history of I were convicted of robbery, the Guidelines range would be 33 to 41 months. *Id.* (Scalia, J., concurring). If, however, the district court found that the defendant discharged a firearm, inflicted serious bodily injury upon a victim, and stole more than $5 million, the Guidelines range skyrockets to 235 to 293 months. *Id.* (Scalia, J., concurring). Justice Scalia then reasoned that

> [w]hen a judge finds all of those facts to be true and then imposes a within-Guidelines sentence of 293 months, those judge-found facts, or some combination of them, are not merely facts that the judge finds relevant in exercising his discretion; they are the legally essential predicate for his imposition of the 293-month sentence. His failure to find them would render the 293-month sentence unlawful. That is evident because, were the district judge explicitly to find *none* of those facts true and nevertheless to impose a 293-month sentence (simply because he thinks robbery merits seven times the sentence that the Guidelines provide) the sentence would surely be reversed as unreasonably excessive.

*Id.* (Scalia, J., concurring).

In response to Justice Scalia's arguments, the majority opinion in *Rita* stated that "the Sixth Amendment concerns he foresees are not presented by this case." *Rita*, 127 S. Ct. at 2466. Justice Scalia thus noted that the majority opinion "does not rule out as-applied Sixth Amendment challenges to sentences that would not have been upheld as reasonable on the facts encompassed by the jury verdict or guilty plea." *Id.* at 2479 (Scalia, J., concurring) (citing *Rita*, 127 S. Ct. at 2466-67; *id.* at 2473 (Stevens, J., concurring)). More recently, in *Gall v. United States*, 128 S. Ct. 586 (2007), Justice Scalia again wrote a concurring opinion emphasizing that "the Court has not foreclosed as-applied constitutional challenges to sentences" and that "[t]he door therefore remains open for a defendant to demonstrate that his sentence, whether inside or outside the advisory Guidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury." *Gall*, 128 S. Ct. at 602-03 (Scalia, J., concurring).

## II. MARLOWE'S AS-APPLIED SIXTH AMENDMENT CHALLENGE

Marlowe argues that his case squarely presents the Sixth Amendment concerns raised by Justice Scalia's hypothetical and that his as-applied challenge should succeed because his sentence of life imprisonment "would not [be] upheld but for the existence of a fact[, here, the mens rea of second-degree murder,] found by the sentencing judge and not by the jury." *Id.* (Scalia, J., concurring). In essence, Marlowe's argument is that we would not have affirmed the district court had the court imposed an upward variance to life imprisonment from a Guidelines range of 210 to 262 months. Having carefully examined the record in this case and the district court's analysis of the § 3553 factors, I disagree.

As the majority opinion aptly summarizes, the evidence presented at trial in this case proved the existence of a violent and depraved conspiracy preying upon inmates at the county jail in Wilson County, Tennessee. The government demonstrated that Marlowe, the supervisor of the second shift at the jail, led a group of officers in regularly and severely beating inmates in the jail. Marlowe and his co-conspirators kept an oral "knock-out list" of inmates whom Marlowe had knocked unconscious with a single blow. Marlowe instructed other guards to strike inmates in the temple because it was a "knock-out point." Marlowe and his co-conspirators denied their victims medical care and falsified incident reports to conceal the origins of the injuries that the conspirators inflicted upon their victims.

The case of Walter Kuntz starkly illustrates the depravity and cruelty of Marlowe's conduct in this case. On January 13, 2003, Marlowe twice beat Kuntz, an inmate who arrived at the jail after being apprehended when he attempted to flee the scene of a minor accident. Kuntz was intoxicated, and after Kuntz failed to comply with Marlowe's command to be quiet, Marlowe administered two separate beatings, which included several blows to the head. When Kuntz continued to make noise, Marlowe ordered that another officer beat Kuntz. Later that evening, after receiving information that Kuntz had undergone brain surgery in the recent past, Marlowe did nothing, even as Kuntz's condition continued to deteriorate into unconsciousness and non-responsiveness. Finally, another officer suggested that Kuntz receive medical attention, but when the officers sought medical attention, neither Marlowe nor any other officer informed the medical personnel that Kuntz had received repeated blows to the head. Instead, the officers sought medical attention for a supposed case of alcohol poisoning. Testimony at trial established that head injuries such as Kuntz's are generally treatable if medical care is obtained within the first hours and that the medical personnel who arrived at the jail would have airlifted Kuntz directly to a trauma center, rather than to a local medical center, had they known that Kuntz had possibly suffered a head injury.

In sum, as counsel for the government summarized at oral argument, the evidence in this case shows that Marlowe and his co-conspirators essentially abused inmates for sport. They tallied a list of noteworthy beatings, even joking about and reenacting particular attacks. They resorted to fraudulent incident reports to conceal their wrongdoing, and this pattern of behavior ultimately resulted in the death of one of the inmates under their supervision.

The district court in this case conducted a lengthy sentencing hearing, receiving testimony from a number of witnesses for both Marlowe and the government. The court noted the case was filled with "heart-wrenching aspects," J.A. at 997 (Sent. Hr'g Tr. at 122), but also recognized that Marlowe was a supervisor in the jail, that he was "very culpable" in Kuntz's death, that the jury convicted him of seven counts, and that substantial evidence at trial concerned Marlowe's abuse of inmates in the jail. J.A. at 998-99 (Sent. Hr'g Tr. at 123-24). The district court noted the sentencing factors contained in § 3553(a), and the "context and the record make clear," *Rita*, 127 S. Ct. at 2469, that the court decided that a sentence of life imprisonment was necessary to reflect the nature and circumstances of this offense, the need to reflect the seriousness of the offense, and the need to provide just punishment.

Under the abuse-of-discretion standard that the Supreme Court has directed that we apply to evaluate the substantive reasonableness of sentences, I am satisfied that the district court exercised its discretion appropriately in determining that Marlowe deserved a sentence of life imprisonment. Accordingly, I concur in the judgment upholding Marlowe's sentence.