NOT RECOMMENDED FOR PUBLICATION
File Name: 09a0284n.06
Filed: April 15, 2009

Nos. 07-5162, 07-5725

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| SIDNEY D. ADAMS and SHEILA | ) | OPINION |
| ADAMS, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

**Before: BOGGS, Chief Judge; and GILMAN and ROGERS, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** Sidney and Sheila Adams, a married couple, were involved in a conspiracy to distribute large quantities of marijuana. After their arrests, they entered into separate plea agreements with the government. Despite agreeing to aid in the government's investigation of the conspiracy, however, the Adamses actually obstructed the investigation by misleading the government as to the location of a large stash of marijuana and the proceeds from its eventual sale.

The Adamses now appeal their sentences on numerous grounds, including their contention that the government breached the plea agreements and that the district court improperly declined to grant certain downward adjustments to their sentences. For the reasons stated below, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

**A.      Factual background**

Starting in 2004, Mr. Adams, along with coconspirator Jeremy Robbins and others, traveled to Arizona on multiple occasions to obtain large quantities of marijuana to resell in eastern Tennessee. Mr. Adams personally made at least three of these trips, obtaining 900 pounds or more of marijuana per trip. Jeremy Robbins was the ringleader of the operation and conducted the drug enterprise from his home in Dandridge, Tennessee. He also arranged to have some of the marijuana stored in a barn on the Adamses' property in nearby Hamblen County. Mrs. Adams observed sizable quantities of marijuana at Robbins's residence and sometimes assisted in repackaging it for resale.

When Robbins was arrested in March 2005, he contacted Mr. Adams and asked him to remove approximately 1,200 pounds of marijuana from the barn. Mr. Adams then assumed full control of the marijuana and sold some or all of it with the help of his friend Chris Oakes. The government did not learn about the marijuana stored in the barn until the following month. By that time, Mr. Adams had already moved and/or sold it. Mr. and Mrs. Adams hid the proceeds of the drug sales from both Robbins—who was then in jail—and the government.

In November 2005, the Adamses signed plea agreements that included a pledge to cooperate with the government in its investigation of the drug conspiracy, but they did not immediately enter guilty pleas in court. Mr. Adams eventually pled guilty in August 2006 pursuant to his plea agreement and was placed in the Blount County Detention Facility to await sentencing. Mrs. Adams did not enter her guilty plea until February 2007 so that she could remain free on pretrial release.

Federal agents interviewed Mr. Adams six times between December 2005 and September 2006. These interviews were conducted pursuant to his plea agreement and were intended to prepare him for his role as a government witness in the trials of coconspirators Robbins and Robbins's wife Diana. The subject of the marijuana stored in the Adamses' barn was covered extensively during the interviews. Mr. Adams gave different answers in each interview regarding the quantity of the marijuana, who moved it (and how), and what happened to it after Robbins's arrest. He claimed at first that Robbins had asked him to move the marijuana to the door of the barn and that, after he complied, unknown individuals retrieved the marijuana overnight. Later, Mr. Adams said that he had delivered approximately 350 to 400 pounds of the marijuana to Robbins's customers, that he had received no payment, and that he then moved the remaining 600 pounds to the door of the barn to be picked up per Robbins's instructions.

Mrs. Adams was interviewed about the relocated marijuana in August 2006. She initially claimed not to remember anything about it, but ultimately told the agents that Mr. Adams was supposed to move the marijuana to the door of the barn, where some person whose identity she did not know or could not recall would collect it.

On September 8, 2006, coconspirator Diane Robbins met with federal agents. She contradicted Mr. Adams's story, telling the agents that Mr. Adams had taken the marijuana from the barn, sold it, and kept the proceeds of around one million dollars for himself. According to Diana Robbins, Mrs. Adams knew about the marijuana and was currently spending the drug proceeds.

Robbins and his wife entered guilty pleas on September 13, 2006, shortly before their scheduled trial, where Mr. Adams was expected to testify as a government witness.

On September 22, 2006, Mr. Adams met with Assistant United States Attorney (AUSA) Hugh Ward and other federal agents. Ward told Mr. Adams at the beginning of the meeting that he was going to file a motion for downward departure based on Adams's "substantial assistance," recommending a sentence of 42 months. Mr. Adams admitted at the meeting that he had lied in his previous interviews and during his preparation for the Robbinses' trial. He also conceded that he would have presented perjured testimony during the trial had the Robbinses not pled guilty.

Mr. Adams stated at the meeting that he and his friend Chris Oakes, on their own initiative, had taken the marijuana from the barn shortly after Robbins's arrest and transported it to a rental house in Rogersville, Tennessee, where it remained for a couple of weeks. Next, at Robbins's request, Mr. Adams moved around 600 pounds of marijuana back to the barn by himself, after which someone else had retrieved it. Mr. Adams admitted delivering marijuana to four of Robbins's customers, but denied receiving any payment. He also denied that he had sold the marijuana himself and kept the proceeds. Mr. Adams claims that, before leaving the meeting, AUSA Ward told Mr. Adams's counsel that he still intended to file the motion for a downward departure, but that he was no longer in a position to tell the court that Adams qualified for a "safety-valve" sentence reduction.

On October 6, 2006, however, AUSA Ward sent a letter to Mr. Adams's counsel informing him that, because Adams had not been truthful in his earlier interviews, Ward was not going to file the motion for a downward departure. Ward instead stated that he was going to ask the district court

to enhance Mr. Adams's sentence for obstruction of justice. The government later filed a sealed sentencing memorandum requesting that the court apply an obstruction-of-justice enhancement to Mr. Adams's sentence. In the memorandum, the government asserted that Mr. Adams had not been truthful in his interviews subsequent to signing his plea agreement, and that he was still withholding information and evidence relevant to the case. The memorandum concluded that, as of that time, Mr. Adams did not meet the criteria for a safety-valve below-minimum sentence.

While Mr. Adams was incarcerated at the Blount County Detention Facility following his guilty plea, he made frequent calls to Mrs. Adams. They knew, based on a warning played at the beginning of each call, that their calls were being recorded and were subject to monitoring. A Drug Enforcement Administration (DEA) agent working on the case subsequently obtained the recordings of those phone calls. The recordings reveal that Mr. Adams instructed Mrs. Adams to lie to the investigators regarding the funds that they had received from the sale of the marijuana. Mr. Adams can also be heard admitting that he had lied to the investigators about the marijuana in the barn, while Mrs. Adams stated that she had lied to her own attorney about the drug money. The tapes reflect the Adamses' evolving strategy regarding how much information to disclose to the investigators. At one point Mr. Adams mulled over the possibility of coming clean with the investigators by "tell[ing] them everything about everything, don't hold anything back. I might have to help them find some things."

In November 2006, when the Adamses were confronted with the recordings, they admitted to the investigators that they were hiding drug proceeds. Mrs. Adams subsequently surrendered

$30,380 through her attorney. DEA agents also recovered an additional $128,000 hidden on the Adamses' property after Mr. Adams revealed the location of the stash.

Mr. Adams was interviewed a final time in December 2006. In that interview, he claimed that he and his cousin, Dion Carter, stored the marijuana from the barn in a van for about a week following Robbins's arrest. He said that he and Chris Oakes subsequently repackaged the marijuana for resale and delivered some of it to Robbins's old customers. Mr. Adams again conceded that he would have perjured himself at the Robbinses' trial had he testified. At the conclusion of the interview, AUSA Ward told Mr. Adams there was no way to be sure that he was telling the truth without the use of a polygraph examination. Ward identified three areas of concern: (1) information he had received from other individuals that, at the time of Robbins's arrest, Robbins had stored $300,000 in drug proceeds in safes in the Adamses' barn; (2) additional information that Mr. Adams had initiated the delivery of marijuana to one of Robbins's customers and collected $100,000 in proceeds; and (3) that Ward could not be positive that Mrs. Adams had turned over all the drug money in her possession.

Mr. Adams's counsel was notified by AUSA Ward the next month that the government would be seeking a sentencing enhancement for obstruction of justice. Ward also stated that Mr. Adams would not qualify for a safety-valve sentence reduction unless Mr. Adams submitted to a polygraph examination. Shortly thereafter, Mr. Adams's counsel arranged for Mr. Adams to take a polygraph test with a private examiner. Mr. Adams was asked about the first two of the three previously mentioned areas of concern identified by Ward. According to Mr. Adams's counsel, Mr.

Adams "passed" the examination. Ward responded, however, that the government would not accept

the results of the examination because it was "self-serving" and had not been administered by the

government.

After her February 2007 guilty plea, Mrs. Adams agreed to submit to a DEA polygraph

examination, which was conducted the following month. The examination consisted of two

significant questions. When Mrs. Adams was asked, "Are you hiding any drug proceeds from the

government?", she responded "no." The polygraph analysis deemed this answer inconclusive.

When Mrs. Adams was asked if she had participated in any drug transactions after posting bond, her

negative answer was deemed to be deceptive. Mrs. Adams was given an opportunity to clarify her

answer. She then admitted that "she had provided marijuana to her friend Misty on seven or eight

occasions after her release." Mrs. Adams also conceded that she took oxycodone although she had

no prescription for the drug.

## B. Procedural history

### 1. Mr. Adams's sentencing

The sentencing hearing for Mr. Adams was held in January 2007. Mr. Adams's counsel

argued for a safety-valve sentence reduction. The district court found that there was "overwhelming

evidence" that Mr. Adams had obstructed—and continued to obstruct—justice, in violation of his

plea agreement, subjecting him to a two-level enhancement under U.S.S.G. § 3C1.1. Citing the same

evidence, the court found that Adams could not meet the requirements for application of the safety-

valve provision of 18 U.S.C. § 3553(f). The court also found that Mr. Adams had not accepted

responsibility for his actions within the meaning of U.S.S.G. § 3E1.1 because he had not been truthful about the disposition of the marijuana left in his possession.

Based on these findings, the Probation Office calculated that Mr. Adams had a total offense level of 34 and a criminal history category of I, resulting in a Guidelines range of 151 to 188 months of imprisonment. The district court then invited the parties to speak regarding an appropriate sentence. Counsel for Mr. Adams argued that, despite the court's finding an obstruction of justice, Mr. Adams had accepted responsibility for his actions and should thus receive no more than the mandatory minimum sentence of 120 months' imprisonment. Mr. Adams then testified, claiming that he had ultimately provided truthful and complete information to the court about his involvement with the marijuana and its proceeds. But he admitted on cross-examination that he had lied during six separate interviews, had also lied to the probation officer who prepared the Presentence Report, and had even lied to his own attorneys until the contents of his jailhouse calls were revealed.

The district court sentenced Mr. Adams to 151 months of imprisonment, the bottom of the applicable Guidelines range. Explaining its decision, the court stated:

> The defendant admitted to obstructing justice in this case and, in the court's opinion, is continuing to obstruct justice by not informing the court of all the information he has relevant to the whereabouts of the missing marijuana and its proceeds. Simply stated, Mr. Adams, I don't believe you.
>
> The court acknowledges that the defendant has worked lawfully his entire life until he was recruited into this conspiracy and has no prior criminal history. Defendant's actions subsequent to signing his Plea Agreement cost him safety valve eligibility as well as a reduction for acceptance of responsibility, resulting in a substantial increase in the length of defendant's sentence.

Thus, the court believes that a sentence at the low end of the Guidelines range is sufficient but not greater than necessary to punish the defendant for his actions . . . .

### 2.    Mrs. Adams's sentencing

Mrs. Adams's sentencing hearing was held in May 2007. Her counsel argued that she was eligible for a sentence reduction due to her acceptance of responsibility for her actions. The government countered that she should be given an enhancement for obstructing justice. Noting that it faced a "difficult issue," the district court ultimately agreed with both sides' arguments. The court found that Mrs. Adams had obstructed justice by protecting her coconspirators and by lying about her financial assets to her probation officer. Mrs. Adams was therefore given a two-level upward adjustment and deemed ineligible for the safety-valve reduction. But because Mrs. Adams had "done everything that the government asked her to do," including taking a polygraph examination, the court found that Mrs. Adams's case presented one of those "extraordinary" circumstances contemplated by Application Note 4 to U.S.S.G. § 3E1.1, where an acceptance of responsibility can coexist with an obstruction-of-justice enhancement under U.S.S.G. § 3C1.1.

The Probation Office calculated Mrs. Adams's total offense level to be 24 with a criminal history category of I, resulting in a Guidelines range of 60 to 63 months. After Mrs. Adams declined her opportunity to speak regarding the appropriate sentence, the court sentenced her to 60 months in prison—the bottom of the applicable Guidelines range.

### II.  ANALYSIS

### A.    Breach of the Adamses' plea agreements

"[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). Mr. and Mrs. Adams argue on appeal that the government breached various aspects of their respective plea agreements. But neither of them made this argument prior to or during their sentencing hearings. We must therefore apply the plain-error standard of review. *See United States v. Swanberg*, 370 F.3d 622, 627 (6th Cir. 2004) (holding that plain-error review applies where a defendant fails to raise an objection during sentencing that the government has breached the plea agreement). For this court to find plain error, the appellant must "show (1) [an] error, (2) that was obvious or clear, (3) that affected [the] defendant's substantial rights[,] and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (internal quotation marks omitted).

### 1. Mr. Adams's arguments

Mr. Adams argues that the government breached its agreement with him in three respects: (1) by using the information he provided "against him," (2) by not moving for a sentence reduction based on his substantial assistance to the government, and (3) by not advising the court of the extent of his cooperation. We address these arguments separately below.

#### a. Use of information provided by Mr. Adams "against him"

Mr. Adams notes that AUSA Ward told him at both the beginning and at the conclusion of their September 2006 interview that Ward was going to file a motion for a downward departure in Mr. Adams's sentence based upon his "substantial assistance." According to Mr. Adams, Ward's

assurances amounted to "a promise not to use anything [Mr. Adams] said against him," assurances that he allegedly relied on to his detriment.

Mr. Adams's assertion that Ward's comments somehow estopped the government from later requesting the sentence that it did is unfounded. Ward simply stated that, as of the September 2006 interview, he intended to seek a sentence reduction based on Mr. Adams's substantial assistance; he never promised that Mr. Adams's future lies to investigators would not cause Ward to change his mind. Moreover, there is no proof that Mr. Adams relied to his detriment on Ward's comments. Rather than immediately telling the whole truth to the investigators, Mr. Adams continued to change his story so as to lead them astray.

Mr. Adams's plea agreement provided in relevant part:

> If, in the opinion of the United States, the defendant renders substantial assistance within the meaning of U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), the United States will file a motion pursuant to one or both of these provisions. The defendant acknowledges that, under the terms of this Plea Agreement, [the] United States retains complete discretion in determining whether a departure motion will be filed . . . .

Because the totality of the evidence indicated that Mr. Adams, rather than providing substantial assistance, actually *impeded* the investigation with his repeated lies, the government was well within its discretion to decline to seek a downward departure and instead to seek an enhancement for obstruction of justice.

### b. *Not moving for a downward departure based on substantial assistance*

Mr. Adams next argues that the government improperly refused to move for a sentence reduction pursuant to U.S.S.G. § 5K1.1. That section of the Guidelines provides in pertinent part as follows:

> Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

*Id.* Under *Wade v. United States*, 504 U.S. 181, 185-86 (1992), however, this court may not consider such an argument absent a showing that the government's refusal to file the motion was based on an unconstitutional motive. "[A]lthough a showing of assistance is a necessary condition for relief, it is not a sufficient one." *Id.* at 187.

The essence of Mr. Adams's argument is that once AUSA Ward stated his intent to file a departure motion, the government no longer retained any discretion in the matter, but "was obligated to file a departure motion unless the defendant breached the Plea Agreement." Even if we accepted this claim for the sake of argument, however, Mr. Adams repeatedly breached the plea agreement because he did not "cooperate fully, truthfully, and completely." Mr. Adams's breaches of the plea agreement thus relieved the government of any obligation to move for a downward departure. Because the government's decision was clearly not based on an unconstitutional motive, such as Mr. Adams's race or religion, his argument on this issue is without merit.

### c. *Failure to inform the court of the nature of Mr. Adams's cooperation*

Finally, Mr. Adams makes the unsupported argument that the government breached his plea agreement by failing to advise the district court of the "nature, extent, and value" of his cooperation.

-12-

But the record indicates that the court was fully aware of the extent of Mr. Adams's "assistance" to the investigators. Because Mr. Adams does not identify what information the government could have presented that was not already before the court, his argument on this point fails.

### 2. *Mrs. Adams's arguments*

Mrs. Adams asserts that the government breached her plea agreement by failing to inform the district court of her efforts to qualify for a sentence reduction based on acceptance of responsibility and/or the safety-valve provision of 18 U.S.C. § 3553(f). But her brief does not identify what information regarding the acceptance of responsibility that the government allegedly failed to bring to the court's attention. Regardless, considering that the court granted a two-level reduction to Mrs. Adams based on her acceptance of responsibility, she could not have been prejudiced by any such failure on the part of the government. To the extent that Mrs. Adams argues that the government was obligated to present any other information regarding downward departures to the court, her argument fails because her plea agreement explicitly provided that the government was making no promises to her. Any expectations that Mrs. Adams might have held based on the prosecutors' prior statements to her would therefore have been superseded by the terms of the plea agreement.

## B. Application of the safety-valve reduction to Mr. and Mrs. Adams

Both Mr. and Mrs. Adams contend that the district court erred in finding that they were not entitled to a safety-valve reduction under the Violent Crime Control and Law Enforcement Act,

18 U.S.C. § 3553(f). This Act permits a district court to sentence below a statutory mandatory

minimum if it finds at sentencing that all of the following five conditions have been met:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

> (3) the offense did not result in death or serious bodily injury to any person;

> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines[,] and was not engaged in a continuing criminal enterprise, as defined in § 408 of the Controlled Substances Act; and

> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense . . . .

18 U.S.C. § 3553(f). These five factors are incorporated into U.S.S.G. § 5C1.2, which, in

conjunction with U.S.S.G. § 2D1.1(b)(6), allows a defendant who meets all five criteria to receive

a two-level safety-valve reduction in his or her offense level.

Defendants bear the burden of proving by a preponderance of the evidence that they are

entitled to a safety-valve reduction. *United States v. Haynes*, 468 F.3d 422, 427 (6th Cir. 2006). A

district court's refusal to find that a defendant qualifies for safety-valve relief is a factual finding that

we review under the clear-error standard. *United States v. Adu*, 82 F.3d 119, 124 (6th Cir. 1996).

> **1.      Mr. Adams**

The district court determined that Mr. Adams had failed to satisfy the fourth and fifth elements of the safety-valve test. Specifically, the court found that Mr. Adams had engaged in a continuing criminal enterprise and that he had not truthfully disclosed to the government all the information he had about the offense.

We need not decide whether the district court erred in finding that Mr. Adams had failed to satisfy the fourth safety-valve requirement because his argument concerning the fifth § 3553(f) element—truthfully providing all of the information he had about the offense by the time he was sentenced—is without merit. Mr. Adams primarily contends that, after his deception was discovered, he did everything possible to convince the government that he was being truthful, including his submission to a polygraph examination. But the district court found at sentencing that "the defendant has obstructed and *continues to obstruct justice* and evade responsibility for his ongoing criminal activity."

The district court's finding that Mr. Adams was still not being truthful at sentencing is supported by the evidence. A DEA agent testifying for the government pointed out that many of the proceeds from the crime were still not accounted for, and the taped telephone conversations show that Adams knew more information than he was sharing with the police. Because the court's distrust of Mr. Adams is well supported by the record, its finding that Adams continued to obstruct justice is not clearly erroneous.

###### 2. *Mrs. Adams*

Mrs. Adams also argues on appeal that the district court should have granted her a safety-valve reduction. Her Presentence Report determined that the safety-valve reduction was not applicable because Mrs. Adams had "not truthfully provided the government with all [the] information and evidence" that she possessed about the offense. The government argued against the reduction before the district court, and the court denied the reduction. Because Mrs. Adams did not object to this determination at the sentencing hearing, we therefore review it under the plain-error standard. *See United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc).

The government asserted that it was unclear whether Mrs. Adams was being truthful at the time of sentencing because she had failed some of the questions on her polygraph examination. Given Mrs. Adams's prior deception, the court could reasonably conclude that she was still withholding information from the government. Moreover, Mrs. Adams did not present any evidence to rebut the government's argument on this issue. The district court's conclusion that she did not carry her burden of proof was therefore not plainly erroneous.

## C. Mr. Adams's acceptance of responsibility

The next issue is Mr. Adams's contention that the district court erred in denying him a reduction in his offense level due to his acceptance of responsibility. United States Sentencing Guidelines § 3E1.1 permits a two-level reduction in the offense level of a defendant who "clearly demonstrates acceptance of responsibility for his offense." The defendant bears the burden of showing that he has indeed accepted responsibility. *United States v. Paulette*, 457 F.3d 601, 608 (6th Cir. 2006). We will not set aside the district court's determination as to whether a defendant has

accepted responsibility unless that determination is clearly erroneous. *Id.; see also* U.S.S.G. § 3E1.1 cmt. n.5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.").

The application of a sentencing enhancement for obstruction of justice ordinarily indicates the defendant's failure to accept responsibility for his actions, although it is not an absolute bar. There may be "extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." U.S.S.G. § 3E1.1, cmt. n.4. Mr. Adams asserts that his is such an extraordinary case. He bears the burden of proving this assertion. *See United States v. Gregory*, 315 F.3d 637, 641 (6th Cir. 2003) ("[I]t is the defendant's burden to demonstrate that his case is extraordinary such that he deserves the downward adjustment." (internal quotation marks omitted)).

Mr. Adams notes that he pled guilty, participated in six interviews with the investigators, and ultimately disclosed to the government significant amounts of truthful information, including the location of $158,000 in drug proceeds. But this argument ignores the fact that Adams repeatedly lied to the investigators even after entering his guilty plea and that they had no way of knowing whether he was still withholding information at the time of his sentencing. Indeed, the district court stated in the sentencing hearing that Adams "obstructed and *continues to obstruct* justice and evade responsibility for ongoing criminal activity." (Emphasis added.)

The cases cited by Mr. Adams to support his argument on this issue are easily distinguishable. One such case is *United States v. Harper*, 246 F.3d 520 (6th Cir. 2001), *overruled*

*on other grounds by United States v. Leachman*, 309 F.3d 377, 384 n.7 (6th Cir. 2002), where this court gave examples of the sort of extraordinary situations in which a defendant who had obstructed justice might still be entitled to a downward departure for acceptance of responsibility. For instance, a defendant awaiting trial might escape custody but then immediately turn himself in to authorities. *Id.* at 528. Similarly, the court noted that a defendant might qualify if he "immediately confessed after writing an obstructive letter and then offered to plead guilty." *Id.* Neither of these examples is even arguably analogous to Mr. Adams's continual obstruction of justice after agreeing to cooperate with the government's investigation.

Mr. Adams also relies on *United States v. Williams*, 176 F.3d 301 (6th Cir. 1999), where one of the defendants, after pleading guilty, provided "timely and complete information to the government concerning his own involvement in the offense." *Id.* at 311 (internal quotation marks omitted). The defendant later recanted his trial testimony and moved to withdraw his plea, necessitating a hearing on the issue, before he restated his original position and once again accepted responsibility. *Id.* This court held that the defendant, who received an obstruction-of-justice enhancement based on the recanting of his trial testimony, was nonetheless subject to a two-level reduction for his eventual full acceptance of responsibility. *Id.* Nothing about Mr. Adams's ongoing scheme of deception parallels the *Williams* defendant's one-time lapse in cooperation.

Finally, Adams cites *United States v. Gregory*, 315 F.3d 637 (6th Cir. 2003), where the defendant admitted that he obstructed justice by accepting and swallowing balloons of drugs given to him by his sister and by writing his sister a letter urging her not to cooperate with the government.

But the defendant then accepted responsibility and "fully cooperated subsequently." *Id.* at 640. All instances of obstruction of justice in *Gregory* occurred before the defendant pled guilty and began cooperating with the government. *Id.* Here, as already noted, Mr. Adams continued to lie to the government long after he supposedly began to cooperate with the investigation.

The facts of Mr. Adams's case align much more closely with a recent case cited by the government—*United States v. Jeross*, 521 F.3d 562 (6th Cir. 2008). In *Jeross*, the defendant in a drug-distribution conspiracy engaged in repeated attempts, both before and after pleading guilty, to obstruct justice by intimidating a coconspirator who was cooperating with the government. *Id.* at 582. Only after the government revised its recommended offense level upwards as a result of his threatening conduct did the defendant begin to cooperate with the government by attending debriefings with investigators. *Id.* This court rejected the defendant's argument on appeal that his case was one of the exceptional few in which an obstruction-of-justice enhancement could coexist with an acceptance-of-responsibility reduction. Considering the defendant's belated decision to cooperate in light of the defendant's long pattern of obstruction, this court held that he had "failed to meet the 'exacting standard' under *Gregory* of showing that he is entitled to an acceptance-of-responsibility reduction after having obstructed justice." *Id*

Here, Mr. Adams's obstruction of justice was arguably even more significant than that of the *Jeross* defendant. There was no suggestion in *Jeross* that the defendant continued to obstruct justice after he began to assist the investigators. Mr. Adams, in contrast, continually lied to the government long after he purportedly began "cooperating" with the investigation. But even if we give Mr.

Adams the benefit of the doubt that he truly "came clean" once he submitted to the polygraph test, that cooperation was no more significant than the debriefings provided by the defendant in *Jeross*, who was not found eligible for the acceptance-of-responsibility reduction. In short, Mr. Adams cannot show that his case is one of the "extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." *See* U.S.S.G. § 3E1.1, cmt. n.4. The district court thus properly declined Mr. Adams's request of a sentence reduction based on his acceptance of responsibility.

**D.      Mrs. Adams's sentence enhancement for obstruction of justice**

We now turn to Mrs. Adams's contention that the district court erred in enhancing her sentence based on obstruction of justice. In reviewing a district court's application of the obstruction enhancement under U.S.S.G. § 3C1.1, we review de novo the determination that specific conduct constituted obstruction of justice, but will not set aside the district court's factual findings unless clearly erroneous. *United States v. Camejo*, 333 F.3d 669, 674-75 (6th Cir. 2003).

Section 3C1.1 of the Sentencing Guidelines provides as follows:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. In finding that Mrs. Adams had obstructed justice, the district court determined that she had personally spent part of the drug proceeds during the course of the investigation, had protected and warned her coconspirators, and had lied to the probation officer regarding her financial

assets. These factual findings were abundantly supported by the record, including numerous recordings of Mrs. Adams discussing her obstructive activities with Mr. Adams. And clearly the district court was correct in concluding that such conduct constitutes obstruction of justice under § 3C1.1. In sum, the court did not err in enhancing Mrs. Adams's sentence based on obstruction of justice.

**E.     The district court's use of the recorded telephone conversations**

The Adamses next contend that the government violated the Fourth Amendment when a DEA agent obtained and reviewed recordings of their conversations over a prison telephone. They also assert that the district court erred by considering those recordings at sentencing. We review a district court's decisions on the admission of evidence at sentencing under the abuse-of-discretion standard. *United States v. Bingham*, 81 F.3d 617, 630 (6th Cir. 1996).

As an initial matter, Mrs. Adams's argument on the issue was arguably waived because she did not object to the admission of the recordings at the sentencing hearing. *See Watkins v. Kassulke*, 90 F.3d 138, 141-42 (6th Cir. 1996) ("[T]he failure of counsel to object in a timely manner to the admission of evidence obtained in violation of the Fourth Amendment waives the right to have that evidence suppressed."); *but see United States v. Caldwell*, 518 F.3d 426, 430 (6th Cir. 2008) ("[T]here is some debate over whether we should treat a suppression argument raised for the first time on appeal as a waiver (subject to review only if the defendant can show 'good cause') or a forfeiture (subject to 'plain error' review)") (internal citations omitted).

Regardless of whether the Adamses' suppression argument was waived as to Mrs. Adams, however, their argument fails on the merits. To challenge a search on constitutional grounds, a defendant must have a "legitimate expectation of privacy" in the thing that was searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104-06 (1980). The Adamses could not have expected privacy where a message at the start of every telephone call informed the inmates that they had no right to privacy and that their conversation was being recorded and possibly monitored. Indeed, Mr. Adams has conceded that he had no such expectation. The Adamses' recorded admissions regarding their obstruction of justice were thus properly admitted by the district court.

## F.    The reasonableness of the Adamses' sentences

The final issue on appeal is the reasonableness of the Adamses' respective sentences.

First, to the extent that Mr. and Mrs. Adams claim that the district court should have departed downward under U.S.S.G. § 5K2.0, such a claim is not reviewable on appeal. We will "not review decisions of a district court not to depart downward unless the record reflects that the district court was not aware of or did not understand its discretion to make such a departure." *United States v. Puckett*, 422 F.3d 340, 345 (6th Cir. 2005) (internal quotation marks omitted). There is no indication in this case that the district court was not aware of or did not understand its discretion to make a downward departure.

Moving on to the overall reasonableness of the Adamses' sentences, "[s]entences imposed post-*Booker* are reviewed for procedural and substantive reasonableness." *United States v. Conatser*, 514 F.3d 508, 519 (6th Cir. 2008). We

must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range.

*Gall v. United States*, 128 S. Ct. 586, 597 (2007).

The Adamses's briefs do not challenge the procedural reasonableness of their sentences. Moreover, we find no indications that the district court committed any procedural errors. The record makes clear that the court reviewed all the relevant information provided by Mr. and Mrs. Adams, the government, and the Probation Office before it imposed the sentences. Thus, neither Mr. Adams's sentence nor Mrs. Adams's sentence was procedurally unreasonable.

We next review the sentences for substantive reasonableness. *Id.* at 594. "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *Conatser*, 514 F.3d at 520. The applicable Guidelines range represents the starting point for substantive-reasonableness review because it is one of the § 3553(a) factors and because the Guidelines purport to take into consideration most, if not all, of the other § 3553(a) factors. *Gall*, 128 S. Ct. at 596-97 & n.6. Although a district court may not presume that the range is reasonable, *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006), a properly calculated within-Guidelines sentence will be afforded a rebuttable presumption of reasonableness on appeal. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006).

Mr. and Mrs. Adams's sentences—which were both at the bottom of their respective Guidelines ranges—were substantively reasonable. The only substantive-reasonableness argument that Mr. and Mrs. Adams clearly articulate in their briefs is that their sentences were unreasonably high relative to those received by their coconspirators. True enough, § 3553(a)(6) requires the sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6); *Conatser*, 514 F.3d at 521. But this factor "concerns *national* disparities between defendants with similar criminal histories convicted of similar conduct—not disparities between codefendants." *Conatser*, 514 F.3d at 521 (emphasis in original). "Disparities between the sentences of coconspirators can exist for valid reasons, such as differences in criminal histories, the offenses of conviction, or one co-conspirator's decision to plead guilty and cooperate with the government." *Id.* at 522.

Here, there are numerous valid explanations for the sentencing disparities between Mr. and Mrs. Adams on the one hand and their coconspirators on the other. Mr. Adams, for example, played the primary role in removing the main stash of marijuana from his barn after Robbins's arrest. He subsequently sold the marijuana on his own initiative. And, as noted extensively above, both Mr. and Mrs. Adams repeatedly obstructed the government's investigation and likely never came completely clean about the location of the marijuana and/or the drug proceeds. These circumstances dictate that the disparities in the sentences of Mr. and Mrs. Adams as compared with those of their coconspirators were entirely justified.

In the absence of any other arguments regarding the substantive reasonableness of their sentences, Mr. and Mrs. Adams have failed to overcome the presumption that their sentences were reasonable. We therefore find no error in their respective sentences of 151 and 60 months of imprisonment.

## VI. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.