NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0388n.06

No. 24-5607

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 05, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| JASON WAYNE AUTRY, | ) ) | |
| Defendant-Appellant. | ) ) ) | OPINION |

Before: CLAY, BUSH, and BLOOMEKATZ, Circuit Judges.

**CLAY, Circuit Judge.** Jason Wayne Autry pleaded guilty to three federal firearms offenses: two counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and one count of possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The district court initially calculated Autry's Sentencing Guidelines range at 168 to 210 months' imprisonment, restricted by an applicable mandatory minimum sentence of 180 months' imprisonment. Ultimately, the district court sentenced Autry to 228 months' imprisonment, reflecting an upward departure from Autry's Guidelines range under U.S.S.G. § 4A1.3(a)(1), because the court believed that the criminal history category reflected in Autry's Guidelines range underrepresented his criminal history. Autry appeals his sentence, arguing that it is substantively unreasonable. We affirm Autry's sentence for the reasons set forth below.

## I.    BACKGROUND

### A.  The Instant Offense Conduct

Early in the morning on December 3, 2020, a Benton County, Tennessee Sheriff's Office ("BCSO") deputy encountered Autry lying in a field in Holladay, Tennessee, wearing pajamas. The officer made contact with Autry and patted him down for weapons but found none. Autry left the scene, but after he left, the deputy surveilled the immediate area and recovered a loaded rifle. The deputy followed Autry and detained him. Autry told the deputy that he was attempting to shoot a deer in the field with the rifle. At this point, the deputy patted Autry down again and found a small quantity of methamphetamine on his person. Autry was subsequently Mirandized and admitted to BCSO investigators that he owned the rifle, and that Danny Joe Ivy sold it to him along with a box of ammunition wrapped in blue tape.

Later on December 3, 2020, the BCSO conducted a warranted search of Autry's vehicle and the residence of Autry's girlfriend, Skylar Pinkley, where Autry was residing. Officers seized ammunition in the search, including the box of ammunition Autry described in his post-arrest statement.

Officers subsequently reviewed surveillance footage of Pinkley's residence. The videos showed that on December 2, 2020, Autry possessed a pistol. The footage also showed Autry holding the rifle, presumably after receiving it from Ivy. In an interview, Ivy admitted that he traded the rifle and ammunition for the pistol officers observed on the surveillance footage. Additional interviews corroborated Ivy's account of the trade and Autry's possession of the pistol. In addition, Autry's ex-girlfriend, Linda Kimbel, was interviewed and stated that Autry stole the pistol from her. An Interstate Nexus Expert from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") further determined that the firearms at issue were not manufactured in

Tennessee, meaning that the firearms traveled in and affected interstate or foreign commerce.  At the time he possessed the firearms and ammunition at issue in this case, Autry was a convicted felon.

### B. Charges and Guilty Plea

Autry was initially charged via criminal complaint on December 3, 2020.  He was subsequently indicted on three federal felony firearms offenses:  two counts of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and one count of possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  As to each charge, the indictment further alleged that Autry "had at least three previous convictions for violent felonies committed on occasions different from one another," in violation of 18 U.S.C. § 924(e).  Third Super. Indictment, R. 62, Page ID #122–24.  Autry pleaded guilty to the charges in the indictment on November 22, 2022, pursuant to a written plea agreement.

In the plea agreement, the parties stipulated to the elements of the charged offenses and the underlying facts as described above.  The parties further stipulated that Autry was guilty of the charges against him, and that before he committed the crimes charged, he had three previous convictions for violent felonies that were committed on occasions different from one another.  The government agreed to recommend that Autry receive a reduction under the Sentencing Guidelines for acceptance of responsibility, conditioned on Autry not committing further offenses and continuing to acknowledge guilt.  In signing the plea agreement, Autry waived his right to appeal the sentence imposed against him, "unless the sentence . . . exceeds the statutory maximum or is the result of an upward departure from the guideline range that the Court establishes at sentencing." Plea Agreement, R. 71, Page ID #134.

3

**C. Guidelines Calculation and Criminal History**

Prior to sentencing, the United States Probation Office ("Probation") prepared a presentence investigation report ("PSR") that calculated Autry's Guidelines range at 168 to 210 months' imprisonment based on a total offense level of 30 and criminal history category of VI. However, because Autry qualified as an armed career criminal, he was subject to a mandatory minimum sentence of 180 months' imprisonment, adjusting the range to 180 to 210 months.

Autry's offense level calculation reflected a base offense level of 24 pursuant to U.S.S.G. § 2K2.1(a)(2) (dictating the base offense level for unlawful possession of firearms or ammunition "if the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of . . . a crime of violence"). Probation recommended a two-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(4)(A) (dictating a two-level increase if "any firearm was stolen"). It also determined that because Autry had at least three prior convictions for a violent felony committed on different occasions, he qualified as an armed career criminal and thus was subject to U.S.S.G. § 4B1.4(b). That section dictates that "[t]he offense level for an armed career criminal is the greatest of" §§ 4B1.4(b)(1), (b)(2) or (b)(3). Section 4B1.4(b)(3)(B) applied the greatest offense level in Autry's case, an offense level of 33. Probation further determined that Autry had not accepted responsibility, but it recognized that the government agreed to recommend a full reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, reducing Autry's offense level to 30. Autry later submitted a statement admitting guilt and accepting responsibility, and the government agreed in its sentencing memorandum that Autry would receive the reduction.

The PSR revealed that Autry had an extensive criminal history dating back to 1994. Pursuant to U.S.S.G. § 4A1.2(e)(3), Probation excluded from its criminal history score calculations Autry's prior convictions for which sentences were imposed over ten years before the commission

of the instant offenses, and for which Autry did not serve any part of his sentence within fifteen years of the commission of the instant offenses. Notably, convictions excluded for untimeliness included assault, burglary, evading arrest, and escape. Under U.S.S.G. § 4A1.2(c)(1), Probation also excluded from its criminal history score calculations Autry's convictions for driving with a revoked or suspended license.

Probation assigned criminal history points for the remainder of Autry's convictions, initially reflecting a criminal history score totaling 17 points. But Probation later supplemented the PSR to add points for a 2012 conviction for aggravated assault, resulting in 20 points for Autry's convictions. Pursuant to U.S.S.G. § 4A1.1(e) (2023), Probation added one status point reflecting that Autry was serving a criminal justice sentence (supervised release) when he committed the instant offenses, for a total criminal history score of 21. Autry's score set his criminal history category at VI (the highest applicable category). Because Autry qualified as an armed career criminal, his criminal history category was further defined as the greatest of the criminal history categories applicable under U.S.S.G. §§ 4B1.4(c)(1), (2), or (3), which in Autry's case was still VI.

Probation further noted that Autry had a history of other criminal conduct for which he was not convicted and sentenced, and therefore was not included in his criminal history score. This history included 1998, 1999, and 2009 charges for assault. The 2009 charge stemmed from a complaint submitted by Autry's mother, who alleged that he violently attacked her. The PSR notes that the 2009 case against Autry was "to be dismissed if [there were] no further issues for six months," but "[t]he court records [we]re not clear as to whether this case was ultimately dismissed." PSR, R. 78, Page ID #205–06. Autry also had a pending charge against him for weapons possession, dating from 2002, for which further information was not available.

## D. Additional Characteristics

The PSR noted mitigating factors in Autry's background. Autry reported that he was physically abused by his father and sexually abused by an aunt in childhood.[1] He has several medical conditions, including Hepatitis C, hypertension, and potential heart failure. He also suffers from mental health issues, for which he has previously sought treatment. Autry has allegedly attempted suicide several times. In the instant case, he was evaluated, at the behest of the court, for competency to stand trial in June and July 2022. Though Autry reported regular experiences with auditory hallucinations during the evaluation, and was therefore temporarily prescribed medication for schizoaffective disorder, the evaluator ultimately determined that Autry was not psychotic. The evaluator also found "no overt evidence of severe mental health distress, anxiety, or depressed mood," contrary to Autry's self-reports. *Id.* at Page ID #210 (internal quotation marks omitted). The evaluator diagnosed Autry with Bipolar II disorder in partial remission due to medication, and several substance abuse disorders (methamphetamines, opioids, cannabis, and alcohol). The evaluator also concluded that it was "possible" that Autry's long-term drug use contributed to "some permanent mental health symptoms," and that Autry could meet criteria for post-traumatic stress disorder and attention-deficit hyperactivity disorder. *Id.* at Page ID #211. However, the evaluator determined that Autry did "not appear to be suffering from a severe mental illness or cognitive deficit that interferes with his ability to understand the nature and consequences of the court proceedings against him or to assist properly in his own defense." *Id.* (internal quotation marks omitted).

---

[1] Autry's aunt testified at the behest of the government at Autry's sentencing hearing and denied any sexual abuse.

## E. Sentencing Hearing and Upward Departure

Prior to sentencing, the government filed a notice of intent to seek a four-level upward departure and upward variance from Autry's Guidelines range. The government argued that because much of Autry's criminal history was underrepresented in his criminal history score, the court should depart upward pursuant to U.S.S.G. § 4A1.3(a), which provides for upward departures when a defendant's calculated criminal history category "substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," even if the defendant's history places him in category VI.

Autry opposed the government's intent to seek an upward departure, requesting a sentence of 180 months' imprisonment, his mandatory minimum sentence, in initial and supplemental sentencing memoranda.

On June 24, 2024, the district court held an extensive sentencing hearing. Neither party objected to the factual statements or factual information in the PSR. The court reviewed and accepted Probation's calculation of Autry's offense level at 33. As anticipated, the court reduced Autry's offense level by three points for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b), reaching a total offense level of 30. The court also followed Probation's recommendation in calculating Autry's criminal history score at 21, per the supplement to the PSR, and his criminal history category as VI. Therefore, the court calculated the same Guidelines range as Probation: 168 to 210 months' imprisonment, restricted by the applicable mandatory minimum of 180 months. Neither party objected to the court's sentencing calculation.

After the court calculated Autry's Guidelines range, the government presented ten witnesses, primarily law enforcement witnesses, who testified to the offense conduct and Autry's criminal history. These witnesses provided more detail as to Autry's criminal background and

offenses that were both accounted and unaccounted for in Probation's calculation of Autry's criminal history score. We recount witness testimony as to Autry's more egregious criminal conduct.

Multiple witnesses testified that Autry was a member of the Aryan Nation, a violent, white supremacist prison gang. Frank Kelsey, formerly a special agent for the ATF, encountered Autry while investigating Aryan Nation involvement in the methamphetamine trade. During his investigation, Kelsey learned that Autry held the rank of enforcer within the Aryan Nation, meaning that he "uph[eld] the rule of law" within the gang and dealt with violators. Sent'g Hr'g Tr., R. 135, Page ID #660. Autry admitted his gang involvement to Kelsey and stated that he was a gang leader outside of prison as well. Kelsey further testified that Autry's Aryan Nation tattoos signified that he had been assaulted or had assaulted someone else for the Aryan Nation, and that he had been a member for a long time. According to Kelsey, Aryan Nation members committed a variety of crimes: "[h]uman trafficking, murder, assaults, burglaries, aggravated burglaries, . . . narcotics distribution, narcotics dealing, narcotics trafficking, narcotics smuggling, auto thefts, . . . [and] various other sorts of petty crimes" both inside and outside of prison facilities. *Id.* at Page ID #664. Kelsey also testified to a jail phone call that he believed represented Autry's trafficking of narcotics while detained on the instant offenses.

Autry's ex-girlfriend, Linda Kimbel, testified to her knowledge that Autry was a member of the Aryan Nation and described an incident in which Autry fought a Black patron at the bar she owned. According to Kimbel, Autry repeatedly attacked the Black patron, elbowing him in the face. Kimbel intervened and was stabbed five times; Autry was also stabbed.

Law enforcement witnesses testified that Autry was generally violent and frequently in trouble with the law. Kelsey testified that many government cooperators he encountered during

8

his investigation of methamphetamine trafficking refused to "testify or talk against" Autry "because they were generally afraid of him." *Id.* at Page ID #673. One former BCSO deputy testified that during his 15-year tenure with the BCSO between 1999 and 2015, he dealt with frequent complaints against Autry. When Autry was incarcerated on various sentences, the deputy believed that crime in the county decreased. A former Decatur County Sheriff's Department officer, Jeremy Pratt, testified that while he was working at the county jail, he was cautioned by fellow officers to be wary of Autry, as he was known to be armed and dangerous. To that point, a United States Marshal testified that Autry had been assaulted in federal detention while awaiting sentencing on the instant offenses.

Additionally relevant testimony centered on the details of Autry's involvement in the abduction and murder of Holly Bobo. Joe Walker, a former agent with the Tennessee Bureau of Investigations who investigated the case, testified briefly. Bobo was kidnapped from her home in April 2011, and her remains were recovered in a wooded area in September 2014. Autry was convicted of facilitation of especially aggravated kidnapping and solicitation of murder in the first degree and sentenced to eight years imprisonment, as noted in the PSR. Walker testified that Autry was initially charged with first-degree murder and especially aggravated kidnapping, but the charges were reduced due to Autry's cooperation in the case against his accomplice, Zachary Adams ("Zachary"). Walker testified specifically to Autry's involvement in disposing of Bobo's body.

In closing argument, the government elaborated on Autry's involvement in Bobo's murder and submitted Autry's testimony from Zachary's trial. In that testimony, Autry admitted to willingly aiding Zachary in disposing of Bobo's body in the Tennessee River when he presumed Bobo to already be deceased. While attempting to dispose of the body, the pair realized Bobo was

9

still alive, so Autry encouraged Zachary to shoot Bobo. Zachary did so, killing Bobo. Autry also testified that, after Bobo's murder, Zachary offered him a portion of a future inheritance in exchange for killing Dylan Adams ("Dylan"), Zachary's brother. Zachary purportedly wished to silence Dylan, who had knowledge of the Bobo murder. Autry lured Dylan into a bass fishing trip and intended to kill Dylan while they were together on the boat, but Autry abandoned the plan when another boater recognized them in the water.

After witnesses were presented, the government reiterated its request for a four-level upward departure, adjusting Autry's Guidelines range to 262 to 327 months' imprisonment. Autry's counsel argued against the departure, attributing Autry's criminal past to a lack of mental health treatment and substance abuse treatment, and asserting that the instant nonviolent offense did not warrant an effective life sentence.

The court calculated Autry's Guidelines range at 210 to 262 months' imprisonment, reflecting a two-level upward departure. Within this range, the court sentenced Autry to serve concurrent sentences of 228 months' imprisonment on each of the three crimes with which he was charged. Autry objected to the court's departure.

To arrive at Autry's sentence, the court first addressed the sentencing factors in 18 U.S.C. § 3553(a). It then adopted the PSR's factual findings as those of the court. The court also summarized Autry's offense conduct. The court stated that it found Autry's criminal history "very concerning," counting 22 prior convictions, including "driving violations, assaults, evading arrest, manufacture of Schedule II controlled substance[s], theft of property . . . , forgery, aggravated burglary . . . , escape," Autry's federal conviction for "[b]eing in possession of a firearm," and his conviction for the facilitation of especially aggravated kidnapping and solicitation of first-degree murder in the Bobo case. *Id.* at Page ID #709–10. The court noted that Autry accrued a criminal

history score of 21, and qualified for an armed career criminal enhancement under U.S.S.G. § 4B1.4(b)(3)(B) because of his prior convictions for violent felonies or drug crimes.

The court also reviewed other aspects of Autry's background, including his claims of sexual and physical abuse in childhood, his medical conditions, and his claims that he had been assaulted four times in while detained in federal prison. The court identified Autry's mental health as an area of "concern and challenge," noting the conclusions of the evaluation conducted to determine Autry's competency. *Id.* at Page ID #712–14. The court further discussed Autry's membership in the Aryan Nation, his history of substance abuse issues, his ninth-grade education, and his limited employment history.

The court then specifically addressed the appropriateness of a departure under U.S.S.G. § 4A1.3(a)(1). The court determined that a § 4A1.3(a)(1) upward departure was appropriate in Autry's case, for several reasons. It first noted that Autry's criminal history was "egregious," "in the sense that it never ends," beginning in 1994 when Autry was 19 years old and continuing without stopping. *Id.* at Page ID #717.

The court considered the factors listed in U.S.S.G. § 4A1.3(a)(2), which indicates the "types of information" that may form the basis for an upward departure under the section. Those factors are:

> (A) Prior sentence(s) not used in computing the criminal history category (e.g., sentences for foreign and tribal convictions).
>
> (B) Prior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions.
>
> (C) Prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order.
>
> (D) Whether the defendant was pending trial or sentencing on another charge at the time of the instant offense.

> (E) Prior similar adult criminal conduct not resulting in a criminal conviction.

U.S.S.G. § 4A1.3(a)(2).

As to the first factor—prior sentences not used in calculating the criminal history category—the court found that, by its calculation, there were 16 instances in which Autry was sentenced but did not accrue criminal history points.

Regarding the second factor—prior sentences of substantially more than one year imposed as a result of independent crimes committed on different occasions—the court found that those were "clearly delineate[d]" in the PSR and noted that Autry had roughly 22 separate convictions. Sent'g Hr'g Tr., R. 135, Page ID #719.

For the third factor—prior similar conduct established by civil adjudication or by failure to comply with an administrative order—the court noted Autry's multiple violations of probation or parole, and multiple instances where he failed to comply with the conditions of release, including on the instant offenses. The court stated that it was "particularly disturbing" that once Autry was released from his sentence on the Bobo case, he immediately began to violate his conditions of supervision. *Id.* at Page ID #719–20. On this issue, the court noted testimony from Kimbel that as soon as Autry was last released from prison, he began drinking, and he later stole Kimbel's firearm. This gave "no indication at all that Mr. Autry intends to comply with any conditions of supervision." *Id.* at Page ID #720.

As to the fourth factor—whether Autry was pending trial or sentencing on another charge at the time of the instant offense—the court noted pending matters shown in the PSR, but indicated that it did not have enough information on those offenses. Regarding the fifth and final enumerated factor—similar adult criminal conduct not resulting in a criminal conviction—the court credited a

12

pending weapons charges from 2002 and an aggravated assault from 1999The court further acknowledged that there were "several instances" in which "Mr. Autry received lenient sentences, either because . . . charges were merged" or ran concurrently, or because of "some level of cooperation." *Id.* at Page ID #722. The court found that Autry was likely to re-offend, and that there was "no indication that he has any intent at all of trying to comply with the rules of a civil society." *Id.* at Page ID #723.

The court concluded that all these factors justified an upward departure. But "considering the [sentencing] factors under [18 U.S.C.] § 3553," including "offsets" in Autry's mental health history, it decided to depart upward by only two levels. *Id.* at Page ID #722. This set Autry's offense level at 32, and his Guidelines range at 210 to 262 months' imprisonment. As noted above, the district court ultimately sentenced Autry to 228 months' imprisonment.

## II.     DISCUSSION

### A. Standard of Review

Autry challenges the district court's decision to depart upward from his Guidelines range. We review the district court's decision to depart upward pursuant to U.S.S.G. § 4A1.3 for abuse of discretion. *United States v. Barber*, 200 F.3d 908, 911 (6th Cir. 2000). The decision to depart "will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." *Id.* at 912 (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)).

We also review a district court's sentencing determinations for reasonableness. *United States v. Nichols*, 897 F.3d 729, 736 (6th Cir. 2018). The reasonableness inquiry has both procedural and substantive components. *Gall v. United States*, 552 U.S. 38, 51 (2007). But in this case, Autry challenges only the substantive reasonableness of his sentence, which we review for

abuse of discretion, even when the sentence imposed is outside the defendant's Guidelines range. *Id.* Under the abuse-of-discretion standard, the fact that we "might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.*

**B. Analysis**

**1. Upward Departure**

Autry nominally challenges only the substantive reasonableness of his sentence. But embedded in his argument is a challenge to the district court's decision to depart upward by two levels. He asserts that "[t]he district court failed to sufficiently explain why Autry's case warranted a two-level upward departure . . . [compared to] other similarly situated defendants and why . . . Autry was deserving of a sentence in the middle of that guideline range rather than the low end." Appellant's Br., ECF No. 18, at 16. So, before addressing why we find Autry's sentence to be substantively reasonable, we discuss why the district court did not abuse its discretion in departing upward.

We must first determine whether the district court departed or varied from the guidelines, a question this Court reviews *de novo*. *United States v. Denny*, 653 F.3d 415, 419 (6th Cir. 2011). Though overlapping facts may support both, the concepts are distinct. A Guidelines departure occurs when the court imposes a sentence outside the advisory range based on a particular Guidelines provision, such as U.S.S.G. § 4A1.3. *United States v. Grams*, 566 F.3d 683, 686 (6th Cir. 2009) (per curiam). A variance, by contrast, refers to the court's "selection of a sentence outside of the advisory Guidelines range based upon the district court's weighing of one or more of the sentencing factors of § 3553(a)." *Id.* at 686–87.

In this case, it is clear that the district court departed upward, rather than varied, from Autry's Guidelines range due to Autry's extensive criminal history. Neither party disputes that the

court departed. So we need not address the issue further, and we need not discuss Guidelines variances.

Having concluded that the district court departed rather than varied, we review whether the district court's decision was an abuse of discretion. *Barber*, 200 F.3d 908, 911 (6th Cir. 2000). To affirm, we must determine that there was a valid basis for the district court's departure and that the degree of departure was reasonable. *See United States v. Crouse*, 145 F.3d 786, 789 (6th Cir. 1998).

The Sentencing Guidelines specifically provide for upward departures from a defendant's Guidelines range "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1). Because the § 4A1.3(a)(1) departure is expressly encouraged by the Sentencing Guidelines, we give substantial deference to a district court's reasoned decision to depart under the provision. *Barber*, 200 F.3d at 912 (2000).

When reviewing an upward departure under § 4A1.3, we consider the *Griffin* factors. They include:

> the seriousness of the defendant's past criminal conduct, the likeliness of recidivism, prior similar adult conduct not resulting in criminal convictions, previous lenient sentences for offenses, whether the sentence will have a deterrence on future criminal conduct, the necessity of isolating the defendant from the community and the length of time necessary to achieve rehabilitation, if rehabilitation is possible.

*United States v. Griffin*, 530 F.3d 433, 441 (6th Cir.2008) (internal quotation marks omitted).

A review of the *Griffin* factors supports the district court's decision to depart upward in this case. Autry had a serious criminal past that included aggravated assault, drug trafficking, burglary, active membership in the violent Aryan Nation, and admitted participation in Holly Bobo's abduction and murder. He had a reputation for violence in his community, was violent toward

15

romantic partners and family members, committed a racially motivated assault, and was involved in violent altercations and drug trafficking while serving prison sentences or detained pre-trial.

Though several of Autry's more serious crimes, including Bobo's murder, were accounted for in Autry's criminal history score and armed career criminal qualification, the district court learned of other crimes, including several violent assaults, that did not count toward these calculations. The district court thus did not rely on Autry's involvement in the Bobo murder to depart. Rather, the court justified the departure based on the overall extent and severity of Autry's criminal history. The departure was proper where several of Autry's convictions were unaccounted for in his previously calculated Guidelines range. *Cf. United States v. Hardy*, 643 F.3d 143, 158 (6th Cir. 2011) (noting that the district court properly considered a defendant's rape offense in departing upward where the offense "received no criminal history points because the sentence was suspended.").

Further, the district court found that Autry was likely to re-offend. This was evidenced by the fact that his criminal history had few gaps. And Autry had been unable to refrain from criminal activity while on probation, parole, or supervised release. Notably, Autry was out of prison and on supervised release for only 79 days before his arrest in this case. Thus, previous sentences were not a deterrent. We have stated that similar circumstances are supportive of upward departures. *See id.* (upholding upward departure where the district "court found the likelihood of recidivism is high, because Hardy's whole life has been a life of crime, and prior bouts in prison and on probation failed to evoke change"). So too in this case.

What's more, Autry has one instance of prior similar conduct not resulting in a conviction—a 2002 firearms offense for which he failed to appear and a disposition remains outstanding. Evidence also suggests Autry received lenient sentences in the past. Specifically, the

charges against Autry in the Bobo case were reduced due to cooperation rather than a lack of culpability, resulting in Autry receiving an eight-year sentence for his participation in the abduction and murder. Evidence further suggests that Autry is a danger to the community. Autry claimed, at his sentencing hearing, that he was disaffiliating from the Aryan Nation. But witnesses testified to his longstanding involvement in the group, noting that his membership both reflected a propensity for violence and directly contributed to violent incidents. Further, several law enforcement witnesses testified to Autry's reputation in the community as a dangerous person.

Thus, the circumstances of Autry's case and background, when viewed in light of the *Griffin* factors, independently indicate that the court was justified in departing upward. In addition, Autry's circumstances are similar to other cases in which this Court has upheld departures under § 4A1.3. *See, e.g.*, *Barber*, 200 F.3d at 912 (holding that the district court was within its discretion to depart upward by three offense levels where the defendant was involved in "an abundance of prior criminal conduct," beginning in his youth). We conclude that there was a permissible basis for the court's departure.

The district court was also within its discretion to depart upward by two levels. Autry argues that the court insufficiently explained the extent of its departure. But where the court departs upward under § 4A1.3, it is not required "to explain formalistically, gridblock-by-gridblock, why each intervening [Guidelines] range is inappropriate." *United States v. Brown*, 371 F.3d 854, 860 (6th Cir. 2004). All the district court must do to satisfy § 4A1.3 is "select[] an appropriate sentence range" by "consider[ing] carefully all the facts and circumstances surrounding the case which affect the departure" and then "determine an appropriate sentence for the particular defendant." *Id.* The district court in this case did just that. The district court's upward departure of two levels was reasonable, as was its choice to impose a sentence of

228 months' imprisonment within the adjusted range. "The reasonableness determination looks to the amount and extent of the departure in light of the grounds for departing." *Crouse*, 145 F.3d at 789 (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)). Where the district court adequately explains and justifies its departure based on § 4A1.3, that departure is not unreasonable. *See United States v. Potts*, 947 F.3d 357, 372–73 (6th Cir. 2020).

In *Griffin*, we upheld a district court's six-level departure where the court thoroughly considered the relevant departure factors under § 4A1.3 and found that the defendant's "criminal history category underrepresented his criminal history and that he was likely to commit other crimes." 530 F.3d at 441. Likewise, a two-level upward departure in this case was not unreasonable where the court found that Autry's Guidelines range substantially underrepresented his criminal history according to the analysis dictated by § 4A1.3(a)(2).

The district court also carefully considered the 18 U.S.C. § 3553(a) factors in fashioning Autry's sentence, noting that it weighed Autry's personal circumstances against his criminal history in deciding to vary upward by only two levels, rather than the four levels requested by the government. This careful consideration confirms that the district court did not abuse its discretion in imposing a two-level upward departure. And because the court sentenced Autry within the range dictated by the departure, albeit toward the middle of the range, we see no abuse of discretion in the district court's decision to impose a 228-month sentence. *See United States v. Marcum*, No. 22-6093, 2024 WL 209445, at *1 (6th Cir. Jan. 19, 2024) (upholding a defendant's sentence at the top end of the new Guidelines range calculated after departure where the district court's upward departure was reasonable).

**2. Substantive Reasonableness**

Autry next argues that his 228-month sentence is substantively unreasonable. "For a sentence to be substantively reasonable, it must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008) (order) (internal quotation marks omitted). "A claim that a sentence is substantively unreasonable is a claim that a sentence is too long (if a defendant appeals)," as in this case. *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). We consider a sentence "substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008).

Where a sentence is within the range recommended by the Sentencing Guidelines, "we presume the sentence was reasonable." *United States v. Sears*, 32 F.4th 569, 573 (6th Cir. 2022) (quoting *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020)). There is no such presumption applied to outside-Guidelines sentences. *United States v. Herrera-Zuniga*, 571 F.3d 568, 582 (6th Cir. 2009). However, a sentence that falls outside a defendant's Guidelines range "is not per se or even presumptively unreasonable." *United States v. Boucher*, 937 F.3d 702, 708 (6th Cir. 2019) (internal quotation marks omitted). Where a court departs upward and sentences a defendant within a post-departure Guidelines range "[s]uch a sentence may not carry the rebuttable presumption of an advisory Guidelines sentence, but the court's use of the revised Guidelines range clarifies the court's justification for the sentence imposed." *United States v. Lumbard*, 706 F.3d 716, 727 (6th Cir. 2013).

19

Autry presents several arguments as to why the sentence range selected and the sentence the district court ultimately reached were unreasonable. He contends that his sentence was unreasonable because (1) it exceeded the national average for similarly-situated defendants by 22 months; (2) the Sentencing Guidelines already accounted for his criminal history and therefore the court failed to properly distinguish his case from a case deserving of a Guidelines sentence; and (3) the district court failed to give proper weight to mitigating factors in Autry's case and unreasonably weighed his criminal history.

We can easily dispose of Autry's first argument. As an initial matter, an above-average sentence, compared to national data, does not independently render a district court's sentence unreasonable. Sentencing courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" pursuant to 18 U.S.C. § 3553(a)(6). But district courts need not "consult the Sentencing Commission's collected data before issuing a sentence." *United States v. Hymes*, 19 F.4th 928, 935 (6th Cir. 2021). Instead, we assume that when a district court correctly calculates a defendant's Guidelines range, it "necessarily take[s] into account the need to avoid unwarranted sentence disparities, viewed nationally." *United States v. Houston*, 529 F.3d 743, 754 (6th Cir. 2008).

In his sentencing memorandum, Autry argued that upward departures for firearms crimes were rare. But he did not argue directly at sentencing that his sentence was disparate. On appeal, he points to statistics stating that the average sentence for a defendant under the Armed Career Criminal Act is 206 months, making his 228-month sentence an outlier among similarly situated defendants.

But this statistical comparison does not "necessarily illuminate the differences among offenders" subject to the armed career criminal enhancement. *United States v. Axline*, 93 F.4th

20

1002, 1013 (6th Cir. 2024). Importantly, only 49.4% of the armed career criminal defendants in Autry's sample also fall into criminal history category VI, indicating that many of Autry's comparators are not similarly situated to him in key respects. Even crediting Autry's statistics, however, the district court's upward departure and sentence were otherwise based on a reasonable consideration of U.S.S.G. § 4A1.3(a)(2) and 18 U.S.C. § 3553(a). Accordingly, the district court did not abuse its discretion, and the sentence imposed is substantively reasonable. *See id.* (stating that "where the district court based its upward variance on several other factors delineated in 18 U.S.C. § 3553(a), it is not required to consider national sentencing statistics."). That is because 18 U.S.C. § 3553(a)(6) dictates only that "unwarranted disparities in sentencing [are] what should be avoided, not those that are warranted." *United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008) (emphasis omitted).

Second, Autry argues that his sentence is substantively unreasonable because, in departing upward, the district court failed to consider that the Sentencing Guidelines already accounted for his criminal history, rendering a sentence in the departure range excessive. But this argument conflates variances with departures. Where a district court *varies* outside of the Sentencing Guidelines, we review the variance to ensure that it is justifiably based on factors in § 3553(a). *See United States v. Aleo*, 681 F.3d 290, 300 (6th Cir. 2012). In that context, "a key question is whether the defendant's case falls within 'the "heartland" to which the Commission intends individual Guidelines to apply.'" *Boucher*, 937 F.3d at 709 (quoting *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)). And we have cautioned that "a defendant's criminal record . . . is usually not a proper reason for a variance precisely because the Guidelines already take it into account." *Id.* at 711. But, as previously explained, the present case is not a variance case. The district departed upward pursuant to U.S.S.G. § 4A1.3(a)(1). As discussed, when the district court's

departure is explicitly contemplated in the Guidelines, the departure is reviewed for a permissible basis and the reasonableness of the degree of departure, with substantial deference due to the district court. *See United States v. Smith*, 27 F. App'x 361, 367 (6th Cir. 2001).

Because, as we previously concluded, the district court's decision to depart and its extent of departure were within the court's discretion, the departure does not render Autry's sentence substantively unreasonable. In addition, the record amply supports the district court's decision to impose a harsher sentence due to the extent and nature of Autry's criminal conduct, both accounted-for and unaccounted-for, under U.S.S.G. § 4A1.3(a)(1) and the 18 U.S.C. § 3553(a) factors. *See Herrera-Zuniga*, 571 F.3d at 589–90 (holding that the court's decision to impose an above-Guidelines sentence was not unreasonable when the record supported that the defendant had an egregious criminal record, was likely to recidivate, and the defendant's PSR detailed criminal conduct that did not result in a conviction or was not included in the criminal history calculation).

Third, Autry argues that his sentence was unreasonable because the district court failed to consider or properly weigh mitigating factors in his background and overweighed his criminal record. He specifically cites his difficult childhood, mental health issues, and substance abuse disorders. He also argues that the district court failed to consider his advancing age and poor physical health in fixing his sentence.

However, a review of the record reveals that the district court gave significant attention to all mitigating circumstances in Autry's background, including those Autry mentions. The court noted Autry's physical condition, which was "testified to many times." Sent'g Hr'g Tr., R. 135, Page ID #712. In doing so, the court acknowledged Autry's statement that he sustained "pretty serious head injuries" in an all-terrain vehicle accident, but found that Autry "didn't indicate that he was continuing to suffer" from the injuries associated with his accident. *Id.* The court also took

note that Autry was receiving medication for his chronic illnesses, including heart failure and Hepatitis C.

In reviewing the factors supporting its decision to depart upward pursuant to U.S.S.G. § 4A1.3, the court found that Autry was likely to re-offend, despite his arguments that older people were less likely to recidivate. At the sentencing hearing, the court acknowledged "empirical studies" provided by Autry's counsel that "have shown that as people age, they tend to be less likely to re-offend." *Id.* at Page ID #273. However, the court found no assurance "from Mr. Autry's situation that would indicate he's not likely to re-offend," given his consistent history of committing crimes despite being subject to supervised release, probation, and parole. *Id.*

The court also covered Autry's history with physical abuse, mental health issues, and substance abuse. It cited Autry's "mental health history" and "childhood experiences" in justifying its decision to depart by two levels, but not "vary upward any more" from Autry's Guidelines range. *Id.* at Page ID #722. So, contrary to Autry's arguments, the district court clearly considered mitigating factors that he claims it ignored.

Further, the district court was within its discretion, in the context of the U.S.S.G. § 4A1.3 departure, to weigh aspects of Autry's criminal history that were accounted for in his Guidelines sentence. Section 4A1.3(a)(2) specifically contemplates the consideration of "[p]rior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions." That factor is distinct from the consideration a defendant's prior sentences not used in computing his criminal history category. Together, these provisions indicate that § 4A1.3 departures are intended to capture conduct both accounted for and unaccounted for in a defendant's criminal history score in order to arrive at a holistic picture of the defendant's criminal history.

23

Autry's substantive reasonableness argument ultimately rests on his view that the district court placed too much weight on his criminal history and not enough weight on mitigating factors. However, Autry does not persuasively show that the district court weighed these competing factors improperly. And a rebalancing of the relevant factors "is not our job under the deferential substantive-reasonableness test." *United States v. Holt*, 116 F.4th 599, 617 (6th Cir. 2024) (rejecting the defendant's argument that "the district court focused too much on the serious nature of his murder and not enough on the mitigating factors" in crafting his sentence); *see also United States v. Sexton*, 894 F.3d 787, 797 (6th Cir. 2018) ("[T]he manner in which a district court chooses to balance the applicable sentencing factors is beyond the scope of the Court's review" (internal quotation marks omitted)).

In this case, the district court appropriately applied an upward departure under U.S.S.G. § 4A1.3 and sentenced Autry within the Guidelines range established by that departure. Therefore, the district court's decision to impose a 228-month sentence was within its discretion, and not substantively unreasonable.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.